1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   LUIS MIGUEL GONZALEZ,                  Case No.  1:18-cv-00039-DAD-HBK

12                 Petitioner,              FINDINGS AND RECOMMENDATIONS TO
                                            DENY PETITIONER RELIEF ON HIS
13          v.                              PETITION FOR WRIT OF HABEAS
                                            CORPUS[1]
14   MICHAEL SEXTON,
                                            FOURTEEN-DAY OBJECTION PERIOD
15                 Respondent.
                                            (Doc. No. 41)
16

17          Before the Court is Petitioner Luis Miguel Gonzalez's counseled amended petition under

18   28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody.  (Doc. No. 41).

19   Respondent filed an answer to the amended petition on December 9, 2020 (Doc. No. 51) and

20   Petitioner filed a reply on February 22, 2021 (Doc. No. 54).  The amended petition raises one

21   claim of trial court error stemming from the trial courts dismissal of a juror and three claims of

22   ineffective assistance of appellate counsel, as more fully discussed *infra*.  For the reasons set forth

23   below, the undersigned recommends the Court deny Petitioner any relief on his petition, as

24   amended, and decline to issue a certificate of appealability.

                               **I.  BACKGROUND AND FACTS**

26          Gonzalez challenges his conviction and sentence for attempted murder, discharging a

27   _____

28   [1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302
     (E.D. Cal. 2019).

firearm at an occupied vehicle, and active participation in a street gang entered by Kern County

Superior Court. (Doc. No. 41 at 1); *People v. Gonzalez*, No. F068060, 2016 Cal. App. Unpub.

LEXIS 4564, at *2 (Jun. 21, 2016). Gonzalez was sentenced to 9 years plus 25 years to life in

state prison for his crimes of conviction. (Doc. No. 41 at 1). The Court adopts the pertinent facts

of the underlying offenses, as summarized by the California Court of Appeal. A presumption of

correctness applies to these facts. *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d

998, 1010-11 (9th Cir. 2015).

### Attempted murder of Daniel Chavez (Counts I and II)

Shortly after 1:00 a.m. on September 12, 2012, Daniel Chavez (Chavez) drove his SUV to a residence on Baker and California Streets to meet a woman. Chavez parked his vehicle on the left side of the street, in front of the residence. He called the woman and said he was there.

Chavez was waiting in his vehicle, with the engine running, when a green Chevrolet Silverado, double cab truck pulled up next to the driver's side of his vehicle. The truck's passenger door opened and a man leaned out. He asked Chavez where he was from. Chavez replied that he did not "bang" and he "wasn't from nowhere."

Chavez testified the man in the green truck's passenger seat turned toward him, pulled a handgun, and immediately fired one shot at Chavez. Chavez was wounded in his right hand. Chavez accelerated his truck and rapidly drove away. Chavez lost control because of his gunshot wound and crashed into a tree. He ran from his vehicle and tried to hide in the neighborhood. He asked a bystander to call the police. The green truck drove around the area several times. Chavez believed they were looking for him.

The police arrived at the scene and Chavez emerged from his hiding place. Chavez told the police that there were at least three people in the truck.

Chavez was taken to the hospital for treatment of a gunshot wound to his right hand. The wound left him unable to use one finger.

### Robbery of Rosa Garcia (Count III)

Also on September 12, 2012, Rosa Garcia (Garcia) was working as a taxi driver and experienced problems with the brakes on her taxi cab. Around 2:20 a.m., Garcia parked her taxi cab at the AM/PM gas station on Union Avenue and called a coworker to help her.

Garcia waited in her taxi cab and left the driver's side door open. She noticed an older model, blue/turquoise extended cab pickup truck drive by the gas pump across from her location. The truck had a loud muffler. The truck's passenger looked at Garcia. The

2

truck went through the gas station and then drove away.

The truck returned within a few minutes.  It pulled alongside Garcia's cab so that the truck's passenger door was adjacent to Garcia's driver's seat.  Garcia could see both the driver and the passenger.

Garcia testified that the man sitting in the passenger seat called out to her, and asked for directions.  As Garcia started to respond, the passenger got out of the truck and walked toward her.  Garcia noticed the truck's driver was Hispanic.  She could not see if someone was sitting in the rear extended cab section of the truck.

As the passenger approached her cab, Garcia saw a gun sticking out of his waistband.  Garcia tried to close her driver's door, but the gunman stepped inside the car and told Garcia, "Give me what you got."  He did not draw the gun.  Garcia was afraid and told the man that she understood.  Garcia turned over $142, which was her taxi fare money from that night.

The gunman got back into the passenger side of the truck, and they left the gas station.  Garcia saw the truck's license plate number and entered it into her cell phone so she could tell the police.

Garcia called the police and provided a description of the truck, the passenger, and the vehicle's license plate number.

**<u>Robbery of Francisco Gonzales (Count IV)</u>**

Sometime around 2:30 a.m. on September 12, 2012, Francisco Gonzales (Francisco) was walking on Baker Street.  A green Chevrolet truck with a loud muffler drove by him.  The truck made a U-turn and drove back to Francisco's location.  The truck's passenger side pulled up to Francisco's location.

Francisco testified a man got out of the passenger side of the truck and walked up to him.  The man pulled a handgun, pointed it at Francisco's head, and asked where he was from.  Francisco said, "I'm not from anywhere.  I was just going home."

Francisco testified he begged for his life and was afraid he was going to be killed.  The gunman cursed and told Francisco to give him everything he had.  Francisco turned over his cell phone, knife, and cash.  Francisco was terrified and said, "Please don't shoot me." The gunman took the property and then punched Francisco in the head with his fist.

The gunman returned to the passenger side of the truck, and the truck "skidded off."  Francisco ran away.

Francisco called 911 at 2:31 a.m.  He told the responding officer that he only saw two people in the truck.

3

**Arrest of Defendants**

Around 3:00 a.m. on September 12, 2012, both defendants were arrested at Israel Lopez's (Lopez) house.  An older model green Chevrolet Silverado SUV was parked in front of the house, and it was registered to Lopez.  The vehicle's muffler made a loud and deep noise.  Defendant Gonzalez's wallet and identification were found in the driver's door compartment.

A grey Buick Regal was also parked in front of Lopez's house.  Defendant Castilleja was sitting in the driver's seat.  Castilleja had two black Samsung cell phones and a Metro PCS cell phone in his possession.  Francisco's knife was found in the sedan.

**Identification of Defendants**

Shortly after defendants were arrested, the police arranged for the victims to participate in separate infield showups just a few hours after the robberies.

An officer drove Garcia to a location for infield showups of Castilleja, Gonzalez, and Lopez.  Garcia stayed in the police car while another officer escorted each man past her location.  When the officer walked by with Castilleja, Garcia said he was too far away and asked the officer to bring him closer.  After she got a closer view of his face, she identified Castilleja as the man who robbed her.  She also identified the green truck as the suspect's vehicle.  She separately looked at Lopez and Gonzalez, but she did not identify them.

Around 6:00 a.m., while Chavez was being treated at the hospital's emergency room, the police separately escorted Lopez, Gonzalez, and Castilleja past his treatment room for showups.  Chavez testified that an officer told him "they caught the ones from the truck, and they were going to show me them."  Officer Stratton, who conducted the showup, denied that he made that statement to Chavez, and testified that he told Chavez that the people he was going to see may or may not have been involved in the incident.

Chavez was initially asked to look at Lopez.  Chavez said Lopez "kinda" looked like the gunman, but he was not sure.  Upon looking at the other two suspects, Chavez immediately identified Castilleja as the driver, and Gonzalez as the passenger and gunman.

A few hours after the robbery, Francisco went to the police station and identified his cell phone.  An officer asked Francisco to look at some suspects in a showup.  Francisco said he was too scared and refused.

Later that morning, an officer contacted Francisco and asked him to look at the suspects at the police station through a mirrored window, where he would not be seen by the suspects.  Francisco agreed and the officer drove him to the station.  The officer told Francisco that they had some people who may or may not have been involved in the crime.  Francisco looked at Castilleja,

4

Gonzalez, and Lopez in separate showups through a mirrored window.

Francisco said he was certain that Castilleja was the man who robbed him.  Francisco looked at Gonzalez twice and did not identify him.  Francisco said he was not sure if Gonzalez was involved in the crime.  Francisco did not identify Lopez, and said he was certain Lopez was not involved.

**Defendants' Postarrest Statements**

After the showups, defendants Gonzalez and Castilleja were separately interviewed at the police department.

Officer Stratton met first with Gonzalez in an interview room and advised him of the warnings pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (*Miranda*).  Gonzalez acknowledged he had an "OB" tattoo that meant the Okie Bakers gang.  Gonzalez said he had been a member of the Okie Bakers since he was 13 years old, and his moniker was "Young One."  Gonzalez said Lopez was known as "Boogie," and he was also a member of the Okie Bakers.

Gonzalez said Lopez owned the green truck.  He said Lopez picked him up in the truck on September 11, 2012, and he stayed with Lopez until the police arrested him later on September 12, 2012.

Stratton then met with Castilleja in an interview room and advised him of the *Miranda* warnings.  Castilleja agreed to answer questions, and said that Lopez was known as "Boogie."

Officer Stratton testified that after the interviews, Castilleja and Gonzalez were held in adjacent holding cells that were separated by a wall.  Officer Stratton heard defendants talk about whether they were going to jail and who they would see there.  Castilleja asked Gonzalez, "Who was that fool that we had to stand in front of at the hospital."  Gonzalez replied, "That was the fool from the truck.  Remember."  Castilleja replied, "Serio?"  Officer Stratton believed that meant, "Seriously."  Gonzalez said, "Yep."

**Interview With Lopez**

Officer Stratton later spoke with Lopez, who acknowledged his nickname was "Boogie."  There was a photograph of Lopez with both defendants on Lopez's cell phone.  Lopez said Gonzalez was known as "Young One" and Castilleja was known as "Grinch."  Lopez had tattoos that said "KC" and the "O" symbol from the Baltimore Orioles.  Stratton suspected the tattoos were gang related, and referred to Kern County and the Okie Bakers.  He asked Lopez about these tattoos.  Lopez said he was a fan of the Kansas City and Baltimore baseball teams, but he did not know anything about the teams or the names of the players.

Lopez said he loaned his truck to defendants that night; he did not

5

go with them; they did not return to his house; and he went to bed.

Yesenia Lara, Lopez's cousin, told the police that Lopez was with her all night and never left the house.

Lopez was released from custody and not charged in this case.

**Trial Identifications**

At trial, Chavez testified he only saw the driver and passenger in the truck that pulled up next to his vehicle. He identified Gonzalez as the passenger and the gunman who shot him. Chavez initially testified that he could not recall if there was a third person sitting in the rear cab section. On further questioning, Chavez testified he might have seen a third person in the truck's rear cab.

It was stipulated that as Chavez entered the courtroom to testify, he saw Lopez in the hallway and identified him as the third person who was in the truck that pulled up next to his vehicle.

Garcia testified that Castilleja was the gunman who robbed her in her cab. Garcia testified she did not identify anyone as the driver because he was too far away to see his face.

Francisco testified he only saw a driver and a passenger in the truck that stopped next to him as he was walking home. He identified Castilleja as the passenger and gunman who robbed him on the street. He did not really see the driver. He did not notice anyone else in the vehicle.

**Lopez's Trial Testimony**

Lopez testified he owned the green Chevrolet truck. He testified both defendants were hanging out at his house on the afternoon and evening of September 11, 2012. Around 10:00 p.m., Lopez loaned his truck and cell phone to defendants. Defendants left in the truck and said they were going to the store. Lopez did not go with them.

Defendants did not return and he went to sleep. The police arrived around 3:00 a.m. on the morning of September 12, 2012. Lopez denied being involved in any gang activity.

**Gang Evidence**

Officer Ryan Vaughn testified as the prosecution's gang expert and explained the Okie Bakers was a criminal street gang that operated in Bakersfield. The Okie Bakers associated with the color blue. It had feuds with the East Side Bakers, Colonia Bakers, and the Norteños. The gang's primary activities were weapons violations, murder, assaults with deadly weapons, shootings, robberies, narcotics sales, and burglaries.

Officer Vaughn testified about several predicate offenses committed by members of the Okie Bakers (other than defendants) in 2009 and 2011, which involved drug sales, firearms, and

shootings.  Vaughn believed the gang was involved in an ongoing pattern of criminal activity.

Several officers testified about numerous personal contacts with both defendants in 2009, 2011, and 2012, which did not involve arrests.  The officers testified they saw defendants' tattoos signifying the Okie Bakers, and defendants admitted they were members of the Okie Bakers.  Castilleja said his moniker was "Grinch," and Gonzalez said his moniker "Young One."

Officer Vaughn testified that based on his personal contacts with both defendants, their tattoos, and their prior statements, he believed defendants were active members of the Okie Bakers gang in September 2012.  He considered Lopez to be an associate of the gang.

In response to a series of hypothetical questions, Officer Vaughn believed that if two members of the Okie Bakers borrowed a car from an associate of the gang, and they committed armed robberies and fired shots at the victims, the offenses were gang related because robberies and assaults with deadly weapons were among the primary activities of that gang.  Vaughn testified that when a gang member asks, "where are you from," that was a gang-motivated challenge about the other person's presence in a particular area of turf.

**Charges, Verdict, and Sentence**

Defendants were jointly charged with count I, attempted murder of Chavez (Pen. Code, §§ 664/187, subd. (a)); count II, discharging a firearm at an occupied motor vehicle, also based on Chavez (§ 246); count III, robbery of Garcia (§ 212.5, subd. (c)); count IV, robbery of Francisco (§ 212.5, subd. (c)); and count V, active participation in a criminal street gang (§ 186.22, subd. (a)).

As to both defendants, it was further alleged that a principal personally discharged a firearm causing great bodily injury as to counts I and II (§ 12022.53, subds. (d), (e)(1)); a principal used a firearm as to counts III and IV (§ 12022.53, subd. (b)), with gang enhancements as to counts I through IV (§ 186.22, subd. (b)(1).

It was separately alleged that Gonzalez had one prior strike conviction. . ..

After their joint jury trial, Gonzalez was found guilty of count I, attempted murder of Chavez; count II, discharging a firearm at Chavez's occupied motor vehicle, with the gang and firearm enhancements found true; and count V, active participation in a criminal street gang. He was found not guilty of count III, robbery of Garcia, and count IV, robbery of Francisco.

. . .

The court granted the prosecution's motion to dismiss the prior

1    conviction allegations against Gonzalez.

2        . . .

3    Gonzalez was sentenced to the upper term of nine years for count I,
     plus 25 years to life for the firearm enhancement; the court stayed
     the terms for the other counts.

4

5    (Doc. No. 28-2 at 3-12).

6                              **II.  APPLICABLE LAW**

7        **A.  AEDPA General Principles**

8        A federal court's statutory authority to issue habeas corpus relief for persons in state

9    custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

10   Penalty Act of 1996 (AEDPA).  AEDPA requires a state prisoner seeking federal habeas relief to

11   first "exhaus[t] the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  If

12   the state courts do not adjudicate the prisoner's federal claim "on the merits," a *de novo* standard

13   of review applies in the federal habeas proceeding; if the state courts do adjudicate the claim on

14   the merits, then the AEDPA mandates a deferential, rather than *de novo*, review.  *Kernan v.*

15   *Hinojosa*, 136 S. Ct. 1603, 1604 (2016). This deferential standard, set forth in § 2254(d), permits

16   relief on a claim adjudicated on the merits, but only if the adjudication:

17           (1) resulted in a decision that was contrary to, or involved an
             unreasonable application of, clearly established Federal law, as
18           determined by the Supreme Court of the United States; or

19
             (2) resulted in a decision that was based on an unreasonable
20           determination of the facts in light of the evidence presented in the
             State court proceeding.
21

22   28 U.S.C. § 2254(d). This standard is both mandatory and intentionally difficult to satisfy.

     *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018); *White v. Woodall*, 572 U.S. 415, 419 (2014).
23
         "Clearly established federal law" consists of the governing legal principles in the
24
     decisions of the United States Supreme Court when the state court issued its decision.  *White*, 572
25
     U.S. at 419.  Habeas relief is appropriate only if the state court decision was "contrary to, or an
26
     unreasonable application of," that federal law.  28 U.S.C. § 2254(d)(1).  A decision is "contrary
27
     to" clearly established federal law if the state court either: (1) applied a rule that contradicts the
28

                                              8

governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts. *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).

A state court decision involves an "unreasonable application" of the Supreme Court's precedents if the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407, (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The petitioner must show that the state court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.

When reviewing a claim under § 2254(d), any "determination of a factual issue made by a State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Burt v. Titlow*, 571 U.S. 12, 18 (2013) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.") (quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

As discussed earlier, for the deferential § 2254(d) standard to apply there must have been an "adjudication on the merits" in state court. An adjudication on the merits does not require that there be an opinion from the state court explaining the state court's reasoning. *Richter*, 562 U.S. at 98. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id*. at 99. "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id*. at 99-100. This presumption applies whether the state court fails to

discuss all the claims or discusses some claims but not others. *Johnson v. Williams*, 568 U.S. 289, 293, 298-301 (2013).

While such a decision is an "adjudication on the merits," the federal habeas court must still determine the state court's reasons for its decision in order to apply the deferential standard. When the relevant state-court decision on the merits is not accompanied by its reasons,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

*Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The federal court "looks through" the silent state court decision "for a specific and narrow purpose—to identify the grounds for the higher court's decision, as AEDPA directs us to do." *Id*. at 1196.

> When . . . there is no reasoned state-court decision on the merits, the federal court "must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Richter*, 562 U.S. at 102. If such disagreement is possible, then the petitioner's claim must be denied. *Ibid*.

*Sexton*, 138 S. Ct. at 2558.

**B. Exhaustion and Procedural Default**

Absent exceptional circumstances, AEDPA precludes federal courts from granting habeas relief unless a petitioner has exhausted all means of relief under state law. Exhaustion of state remedies requires that the state prisoner "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights[.]" *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (citing *Picard v. Connor*, 404 U.S. 270, 275-76 (1971)); *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (explaining that to satisfy the exhaustion requirement, a petitioner must provide the highest state court with a full and fair opportunity to consider each claim before presenting it to the federal court). The

petitioner must apprise the state court of the federal constitutional issue, not just the underlying facts of the claim or a similar state law claim. *Anderson v. Harless*, 459 U.S. 4, 6 (1982) ("It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made.").

In addition, a federal habeas court is precluded from considering claims which are not exhausted and would clearly be barred if petitioner returned to state court and raised them. *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991) (if a petitioner has failed to exhaust state remedies and the state court to which the petitioner would have to present his claims to meet the exhaustion requirement would now find the claims procedurally barred, there is a procedural default for federal habeas purposes regardless of the decision of the last state court to which the petitioner actually presented his claims).

Finally, a federal court must dismiss those claims or portions of claims denied on adequate and independent procedural grounds under state law. *Id*. at 750. If a petitioner attempts to raise a claim in a manner not permitted by state procedural rules, he is barred from pursuing the same claim in federal court. *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

However, a petitioner can avoid the application of procedural default by establishing objective cause for failing to properly raise the claim in state court and actual prejudice from the alleged constitutional violation. *Coleman*, 501 U.S. at 750. To show cause, a petitioner must demonstrate something external, "something that cannot fairly be attributed to him," that prevented him from raising the claim in state court. *Id*. at 753; *Bradford v. Davis*, 923 F.3d 599, 612 (9th Cir. 2019). To show prejudice, a petitioner must demonstrate an error that worked to his actual and substantial disadvantage, infecting the entire trial with constitutional error. *See Murray*, 477 U.S. at 494.

A second exception, known as the fundamental miscarriage of justice, only occurs in an extraordinary case, where a "constitutional violation has probably resulted in the conviction of one who is actually innocent[.]" *Murray*, 477 U.S. at 479-80. Actual innocence means factual innocence, not legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623 (1998). To meet this standard, a petitioner must "show that it is more likely than not that no reasonable juror

1   would have convicted him" of the underlying offense.  *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

2   "To be credible, a claim of actual innocence must be based on [new] reliable evidence not

3   presented at trial."  *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (quoting *Schlup*, 513 U.S.

4   at 324).

## III.  ANALYSIS

### A.  First Ground for Relief: Excused Juror

In his first ground for relief, Petitioner claims the trial court's removal of a holdout juror

during deliberations violated his right to due process and a fair trial under the Fourteenth

Amendment and to a fair and impartial jury under the Sixth Amendment.  (Doc. No. 41 at 5).

Respondent argues Petitioner is making a jury unanimity claim, which was not raised in the state

courts.  (Doc. No. 51 at 15).

### 1.  Jury Claim Raised in the State Courts was Fairly Presented

Habeas petitioners must "fairly present" federal claims to the state courts to give the state

the "opportunity to pass upon and correct alleged violations of its' prisoners' federal rights."

*Picard v. Connor*, 404 U.S. 270, 275 (1971).  "A litigant wishing to raise a federal issue can

easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by

citing in conjunction with the claim the federal source of law on which he relies."  *Baldwin v.

Reese*, 541 U.S. 27, 32 (2004).  An inquiry into whether a petitioner has fairly presented his claim

is not "mechanical, but requires examination of what the petitioner said and the context in which

[he] said it."  *Galvan v. Ala. Dep't of Corr.*, 397 F.3d 1198, 1205 (9th Cir. 2005).  A litigant fairly

presents his claim where he "explicitly alerts the court [he] was making a federal constitutional

claim."  *Id.*

Here, before the California Court of Appeal, Petitioner argued that the "trial court violated

[his] constitutional rights to due process and a fair trial when it decided to discharge a juror for

alleged misconduct in the midst of deliberations."  (Doc. No. 28-2 at 2).  Before the California

Supreme Court, Petitioner claimed "[t]he trial court violated my due process right to a fair trial

under the [F]ourteenth [A]mendment to the U.S. Constitution when it removed juror No. 7 during

12

1  deliberations."[2]  (Doc. No. 28-3 at 5).  In his amended petition, Petitioner claims that the "trial

2  court's removal of hold-out juror during deliberations violated Petitioner's right to due process

3  and fair trial under the 14th Amend., and to a fair and impartial jury under the 6th Amend."  (Doc.

4  No. 41 at 5).

5  　　　Respondent's mischaracterizes Petitioner's claim as a jury unanimity claim.  (Doc. No. 51

6  at 15).  The record reflects Petitioner presented the same claim before the state courts and this

7  Court, namely that the trial court violated his constitutional rights when it removed the juror in

8  question.  Petitioner does not mention the right to a unanimous jury at all—but rather claims that

9  the removal of the juror itself violated his constitutional rights.  Accordingly, the Court rejects

10  Respondent's characterization of the claim as one of jury unanimity and likewise rejects

11  Respondent's argument that the claim is unexhausted.  Finding Petitioner exhausted his first

12  ground for relief, the Court now turns to address the merits of the claim.

13  **2. State Court Denied Claim on the Merits**

14  **a. Background**

15  　　　The record reflects that juror number 7 was dismissed on the third day of deliberations

16  because the trial court found she was biased against law enforcement and was using her own

17  personal beliefs and experiences to inform her decision making, rather than following the law and

18  jury instructions.  (Doc. No. 28-2 at 29).  Preceding the dismissal, the jurors wrote three notes to

19  the judge.  The first note stated: "In the case where a juror is using 'life experience,' and claims to

20  have been treated wrongly by police in the past and refuses to believe police officers' testimony,

21  what is the rest of the jury to do?"  (Doc. No. 28-13 at 9).  At that point, the judge read some of

22  the jury instructions to the jury regarding deliberations.  (*Id*. at 17-23).  The judge then questioned

23  juror number 7 individually.  (*Id*. at 27-32).  Juror number 7 said she was considering her life

24  experiences in making decisions, but that she did not discount any witness' testimony based on

25  her life experiences.  (*Id*.).  The judge interviewed the foreperson, who stated that all the jurors

26  were able to express themselves fully.  (*Id*. at 37-38).  The judge again questioned juror number 7,

27  _____

28  [2] The Court notes that Petitioner's California Supreme Court petition is partially illegible.  (*See* Doc. No. 28-3).  Nevertheless, the Court can ascertain the parts relevant to the instant merits review.

and she stated that she was using her life experience in her decision making, the foreperson had called her biased, she was not biased against law enforcement, and she was willing to continue deliberating.  (Doc. No. 28-14 at 20-37).

The judge interviewed the foreperson again, asking her whether she had told juror number 7 that she was biased.  (Doc. No. 28-15 at 11).  The foreperson told the judge that juror number 7 had said that some police officers are dishonest and that she had been profiled by police officers.  (*Id*. at 11-12).  The foreperson said juror number 7 refused to follow the jury instructions and instead relied on her personal experience to make decisions about the case.  (*Id*. at 13).  The judge next interviewed each of the jurors separately.  (*Id*. at 16-47).  All the jurors said that juror number 7 was using her own experience of being profiled by the police rather than the law provided to make her decisions and that she was basing her decisions on her outside knowledge of the law.  (*Id*.).  Some of the jurors opined that juror number 7 was biased against law enforcement.  (*Id*.).

At the close of the judge's questioning of the jurors, the defense moved for a mistrial and the state moved to dismiss juror number 7.  (*Id*. at 47-49).  The judge denied the defense's motion for mistrial and granted the state's motion to dismiss juror number 7.  (*Id*. at 58).  The judge found that juror number 7 had a "blanket mistrust of law enforcement and of all witnesses called by the prosecution."  (*Id*.).  Moreover, the judge found that juror number 7's statement that she knows the law and is applying that law rather than the law as explained in the jury instructions was improper.  (*Id*. at 59).  The judge said that juror number 7 "exhibited bias against law enforcement" and "refused to follow the law in that she's injected her own understanding of the law and her own beliefs as to what the law says particularly, but not limited to, her discussion of when six-packs and in-field show ups should be done."  (*Id*. at 60).  The judge then dismissed this juror.  (*Id*. at 62).

Soon after the court dismissed the juror, she submitted a letter to counsel and the court.  (Doc. No. 41-6 at 2).  In summary, juror number 7's letter stated she was not convinced by the evidence presented by the prosecution, some of the jurors berated her when she shared her opinions, some jurors called her biased, and the trial judge stated she could use her life

1  experiences when deliberating.  (*See generally id*.).  The defense then moved for a new trial due

2  to juror number 7's letter, which the judge denied.  (Doc. No. 28-2 at 33).

3  **b. State Court of Appeal Last Reasoned Decision**

4  Petitioner's claim was denied on the merits by the state court of appeal (Doc. No. 28-2 at

5  45) and summarily denied by the California Supreme Court.  (Doc. No. 28-4).  Accordingly, the

6  Court "looks through" to the court of appeals' reasoned decision denying this claim.  *Wilson v.*

7  *Sellers*, 138 S. Ct. 1196.  On direct appeal, Petitioner argued that the trial court violated his due

8  process right to a fair trial under the Fourteenth Amendment when it excused juror number 7

9  during deliberations.  (Doc. No. 28-22 at 21; Doc. No. 50-1 at 25[3]).  The court of appeal rejected

10  Petitioner's claim, finding that juror number. 7 was properly dismissed.  (Doc. No. 28-2 at 45).

11  The court of appeal provided a detailed analysis as to why Gonzalez's right to a fair trial was not

12  violated:

14  > We begin with the process used by the court in this case.  When the
   > trial court is notified that a juror has a disqualifying bias, it has a duty
15  > to investigate the allegation.  (Lomax, supra, 49 Cal.4th at p. 592.)
   > "Out of concern to protect the sanctity of jury deliberations, we have
16  > cautioned that this inquiry 'should be as limited in scope as possible'
   > and 'should focus upon the conduct of the jurors, rather than upon
17  > the content of the deliberations.' [Citation.]  'Additionally, the
   > inquiry should cease once the court is satisfied that the juror at issue
18  > is participating in deliberations and has not expressed an intention to
   > disregard the court's instructions or otherwise committed
19  > misconduct, and that no other proper ground for discharge exists.'
   > [Citation.]"  (Ibid.)

20  > The court's inquiry in this case was sufficiently restrained.  In
21  > response to the foreperson's first note, it initially questioned the
   > foreperson and reinstructed the jury.  It then questioned Juror No.7
22  > and asked what it could do to assist the deliberative process.  Juror
   > No. 7 asked the court to speak to the foreperson on her behalf.  The
23  > court did so, again re-instructed the jury, and advised the prosecutor
   > there was no basis to remove Juror No. 7.

24  > It was only after Juror No. 7's second note, and her responses to the
25  > court's questions, that the court decided to question the rest of the
   > jurors.  In doing so, the court did not affirmatively ask the other
26  > jurors about Juror No.7, and did not permit the attorneys to question
   > the jurors.  Instead, the court generally asked the jurors whether

---

[3] Petitioner joined in the arguments made by his co-defendant, Castilleja, on appeal.  (*See* Doc. No. 28-22 at 21).

everyone had the chance for free and open discussion.  Nearly every juror responded by bringing up Juror No. 7 on his or her own accord, and offered similar descriptions of Juror No. 7's repeated refusals to follow the instructions, intent to rely on her alleged personal knowledge of the law, and her avowed personal bias against all law enforcement officers because of an unrelated incident.

The court's careful examination of each juror, and its lengthy findings, created a record which showed a demonstrable reality that Juror No. 7 committed misconduct during deliberations by deciding the case based on her own personal bias.  "[A] bias against law enforcement officers that renders a juror unable to fairly weigh police testimony is grounds for the juror's replacement. [Citations.]"  (*People v. Barnwell, supra*, 41 Cal.4th 1038, 1051.) Juror No. 7's categorical position that all law enforcement witnesses were not credible, regardless of the evidence, "reflected an undisclosed bias that rendered [her] unable to perform [her] duty as a juror and properly subject to discharge under section 1089. [Citation.]"  (*Lomax, supra*, 49 Cal.4th at p. 591.)

Nearly every juror independently attributed these type of comments to Juror No. 7.  Juror No. 2 (the foreperson) said Juror No. 7 did not believe the witnesses based on her "personal experience" of being profiled, but Juror No. 7 never explained how she used her personal experience to decide the credibility of witnesses.  Juror No. 1 said that Juror No. 7 did not believe the police based on her life experience.  Juror No. 5 quoted Juror No. 7 as saying that she judged the credibility of witnesses based on her prior experience of being stereotyped by the police.  According to Juror No. 8, Juror No. 7 said she did not "believe a word" the testifying officers said because of her prior experiences.  Juror No. 10 did not identify Juror No. 7 as the source, but similarly said a juror kept talking about her prior bad experiences with the police, and "she wants to dismiss all the officers' testimonies" because of her bad experiences.  Juror No. 10 also said this particular juror said she was not going to believe the facts or the law of the case "because of what she's seen in her history."  Juror No. 11 quoted Juror No. 7 as saying "she didn't believe any of the officers" because of her "life experience."

Juror No. 7 also committed misconduct by insisting that she personally knew the law based on her employment experience, and her stated refusal to follow the court's instructions on the law.  As explained by Juror No. 3, Juror No. 7 said she "knew how the law worked specifically."  Juror No. 4 said Juror No. 7 claimed to have "a knowledge of the law outside of the law that we were to put into this case," and Juror No. 7 said her knowledge of the law "superseded the jury instructions that we had."  Juror No. 2 (the foreperson) said Juror No. 7 did not want to follow the instructions. Juror No. 5 stated that Juror No. 7 said she knew the law because she worked with correctional officers, and she was relying on her alleged knowledge of the law instead of the law and evidence as presented at trial.  Juror No. 8 similarly quoted Juror No. 7 as saying she "knows the law."  Juror No. 9 quoted Juror No. 7 as

saying that she knew the law, and the police "botched" the case because it was the "law" to test for gunshot residue.  According to Juror No. 11, Juror No. 7 said she knew the law, she worked around officers, she knew some of them were bad, and "that's why she's not believing any of the officers, their testimony."

Defendants assert that a juror does not commit misconduct by relying on his or her personal experiences.  Defendants are correct that courts "expect jurors to use their own life experiences when evaluating the evidence. [Citation.]"  (*Wilson, supra*, 44 Cal.4th at p. 823.).  "[D]uring the give and take of deliberations, it is virtually impossible to divorce completely one's background from one's analysis of the evidence.  We cannot demand that jurors, especially lay jurors not versed in the subtle distinctions that attorneys draw, never refer to their background during deliberations."  (*People v. Steele* (2002) 27 Cal.4th 1230, 1266, 120 Cal. Rptr. 2d 432, 47 P.3d 225.)

"It is not improper for a juror, regardless of his or her educational or employment background, to express an opinion on a technical subject, so long as the opinion is based on the evidence at trial.  Jurors' views of the evidence, moreover, are necessarily informed by their life experiences, including their education and professional work."  (*In re Malone* (1996) 12 Cal.4th 935, 963, 50 Cal. Rptr. 2d 281, 911 P.2d 468.)

"A juror may not express opinions based on asserted personal expertise that is different from or contrary to the law as the trial court stated it or to the evidence, but if we allow jurors with specialized knowledge to sit on a jury, and we do, we must allow those jurors to use their experience in evaluating and interpreting that evidence."  (*People v. Steele, supra*, 27 Cal.4th at p. 1266.)  However, "[a] fine line exists between using one's background in analyzing the evidence, which is appropriate, even inevitable, *and injecting 'an opinion explicitly based on specialized information obtained from outside sources,' which we have described as misconduct.* [Citation.]"  (*Ibid.*, italics added).  "A juror ... should not discuss an opinion explicitly based on specialized information obtained from outside sources.  Such injection of external information in the form of a juror's own claim to expertise or specialized knowledge of a matter at issue is misconduct. [Citations.]"  (*In re Malone, supra*, 12 Cal.4th at p. 963.)  For example, *Wilson* held that the trial court erred in removing a juror at the penalty phase because the record did not show to a "demonstrable reality" that he was unable to perform his duty.  (*Wilson, supra*, 44 Cal.4th at p. 814.)  The challenged juror explained that his decision was based on mitigating evidence about the defendant's abusive and dysfunctional family.  (*Id.* at pp. 814, 824.)  Although the juror appeared to have weighed the mitigating evidence more heavily than did the other jurors because of his experience as an African-American father, *Wilson* concluded his reliance on life experience was appropriate at the penalty phase and did not render him unable to serve.  (*Id.* at p. 831.)  In contrast to *Wilson*, there was no indication in this case that Juror No. 7 relied on any admissible evidence, aside from her own personal

17

experience, to conclusively determine that all law enforcement witnesses in this case were not credible.  Instead, she repeatedly stated that she did not believe the prosecution witnesses because of her prior experience being "racially profiled" in Rosedale.

Juror No. 7's conduct was similar to the situation addressed in *In re Stankewitz* (1985) 40 Cal.3d 391, 220 Cal. Rptr. 382, 708 P.2d 1260, where a juror "consulted his own outside experience as a police officer on a question of law," and reached a legal conclusion that was "totally wrong."  (*Id.* at p. 399.)  *Stankewitz* held that had the juror merely kept his opinion to himself, "his conduct might be the type of subjective reasoning that is immaterial for purposes of impeaching a verdict."  (*Id.* at p. 400.)  But his actions rose to the level of reversible misconduct when he shared the erroneous opinion with other jurors,and vouched for its correctness on the strength of his long service as a police officer.  (*Ibid.*)

When the trial court addressed this situation, defendant complained that the court should have brought Juror No. 7 back for further questions after it had talked to the other eleven jurors, in order for Juror No. 7 to refute the allegations they made against her.  A trial court, having heard evidence of a juror's "disabling bias," is permitted but not required to attempt "to rehabilitate that juror by further exploring what the juror really meant," and the court does not abuse its discretion "concluding there was no need to question [the juror] further because [her] disqualification was clear . . .." (*People v. Fuiava, supra*, 53 Cal.4th at p. 715.)

The trial court did not abuse its discretion when it declined to question Juror No. 7 for a third time.  It had talked to Juror No. 7 twice, and Juror No. 7 had already made inconsistent statements about her conduct.  During the second round of questions, the court asked Juror No. 7 what type of personal experience she was relying on.  Juror No. 7 said she had worked for the military and the government since she was 18 years old, she had worked for the Department of Corrections for 13 years, and added, "[s]o why [*sic*] I . . . be bias against police officers or law enforcement?"  The court asked Juror No. 7 whether she had used her "special knowledge or experience" to judge the witnesses instead of considering the evidence.  Juror No. 7 said no, and complained the other jurors were bullying her.  Upon further questioning, however, Juror No. 7 contradicted herself when the court asked if she had negative personal experiences with law enforcement.  Juror No. 7 said she told the jurors that she had been racially profiled by the police in Rosedale, she told the jurors what happened to her, and that factored into her determination that a law enforcement witness was not credible.

The other 11 jurors, when generally asked about whether each juror had been able to freely discuss his or her opinions, separately attributed identical statements to Juror No. 7 — that she did not believe any of the prosecution witnesses because of her personal experience, and she was going to rely on her own knowledge of the law and not on the court's instructions.

Defendant also complained that the other 11 jurors committed misconduct toward Juror No. 7 because Juror No. 7 reached a different verdict, and disagreed with their opinions and conclusions. "[R]emoval of a holdout juror is proper where the facts demonstrate the juror is unable to follow the law.  [Citation.]"  (*People v. Harrison* (2013) 213 Cal.App.4th 1373, 1382, 153 Cal. Rptr. 3d 616.)  The "trial court's attempt to ensure the jurors understood the law," and removal of a holdout juror who would not or could not follow the law, "cannot be viewed as an improper attempt to overcome a deadlock in the jury's deliberations."  (*People v. Alexander* (2010) 49 Cal.4th 846, 928, 113 Cal. Rptr. 3d 190, 235 P.3d 873.)  "The substitution of a juror for good cause pursuant to section 1089, even after deliberations have commenced, "does not offend constitutional proscriptions."  [Citation.]"  (*Wilson, supra*, 44 Cal.4th at pp. 820-821.)

*Gonzalez*, No. F068060, at *58-67.

### 3.  Petitioner Fails to Show State Court's Rejection of Claim Contrary to Clearly Established Federal Law or Based on Unreasonable Determination of the Facts

The Sixth Amendment guarantees a criminal defendant the right to a "fair trial by a panel of impartial, indifferent jurors."  *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (internal quotation marks and citations omitted).  A defendant is entitled to a jury composed of "jurors who will conscientiously apply the law and find the facts," *Lockhart v. McCree*, 476 U.S. 162, 178 (1986), and that is "capable and willing to decide the case solely on the evidence before it," *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984) (internal quotation marks omitted).  While the Constitution "lays down no particular tests" to determine whether a juror is biased, *United States v. Wood*, 299 U.S. 123, 146 (1936), the Supreme Court has held an impartial jury consists of "jurors who will conscientiously apply the law and find the facts."  *Wainwright v. Witt*, 469 U.S. 412, 423 (1985); *see also Lockett v. Ohio*, 438 U.S. 586, 596-97 (1978) ("[T]he right to a representative jury [does not include] the right to be tried by jurors who have explicitly indicated an inability to follow the law and instructions of the trial judge."); *Irvin v. Dowd*, 366 U.S. 717, 723 (1961) (defining an "impartial juror" as one who "can lay aside his [or her] impression or opinion and render a verdict based on the evidence"). *See also Williams v. Johnson*, 840 F.3d 1006, 1010 (9th Cir. 2016) (Recognizing that although "we don't know precisely what it means for a juror to be biased," "we know that biased

19

1   jurors may be dismissed from deliberations without offending the Constitution.").

2          Here, the state court of appeal found that "[t]he [trial] court's careful examination of each

3   juror, and its lengthy findings, created a record which showed a demonstrable reality that Juror

4   No. 7 committed misconduct during deliberations by deciding the case based on her own personal

5   bias." (Doc. No. 28-2 at 39).  The record reflects the trial court interviewed all 11 jurors at least

6   once and interviewed juror no. 7 and the foreperson multiple times.  Moreover, Petitioner's

7   counsel participated fully in the juror misconduct hearings.  The court of appeal recounted the

8   jurors' testimony regarding juror number 7, finding that the jurors' statements sufficiently

9   demonstrated that juror number 7 was biased.  (Doc. No. 28-2 at 39).  The appellate court found

10  that juror number. 7's "categorical position that all law enforcement witnesses were not credible,

11  regardless of the evidence" demonstrated an undisclosed bias that made it impossible to perform

12  her duty as a juror.  (*Id*.).  The court of appeal also found that juror number 7 "committed

13  misconduct by insisting that she personally knew the law based on her employment experience,

14  and her stated refusal to follow the court's instructions on the law." (*Id*.).  The appellate court

15  found that "[t]he other 11 jurors, when generally asked about whether each juror had been able to

16  freely discuss his or her opinions, separately attributed identical statements to [j]uror [number] 7

17  that she did not believe any of the prosecution witnesses because of her personal experience, and

18  she was going to rely on her own knowledge of the law and not on the court's instructions." (*Id*.

19  at 43).  Essentially, the state court found that juror 7 "indicated an inability to follow the law and

20  instructions of the trial judge." *Lockett v. Ohio*, 438 U.S. at 596-97.

21         Based on a review of the record, Gonzalez fails to show that the appellate court's denial of

22  his juror dismissal claim was contrary to, or an unreasonable application of, clearly established

23  federal law, or that the appellate court's decision was based on an unreasonable determination of

24  fact.  The appellate court's decision was not "so lacking in justification that there was an error

25  well understood and comprehended in existing law beyond any possibility for fairminded

26  disagreement." *Richter*, 562 U.S. at 103.  Accordingly, Gonzalez is not entitled to habeas relief

27  on his first ground for relief and ground one should be denied.

28

**B. Ineffective Assistance of Appellate Counsel Claims**

In grounds two, three and four, Petitioner raises three claims of ineffective assistance of appellate counsel ("IAAC"). (Doc. No. 41 at 7, 8-11). Specifically, Petitioner assigns constitutionally ineffectiveness to appellate counsel for failing to challenge on direct appeal the following "viable issues": (1) failing to challenge the tainted show-up identification procedure; (2) failing to raise an issue that petitioner's due process rights under the Fourteenth Amendment were violated when the trial court instructed the jury on CALCRIM 315, concerning witness certainty in evaluation eyewitness identification; and (3) failing to raise an ineffective assistance of trial counsel for not objecting to the tainted identification procedures and jury instruction CALCRIM 315 claim. (*Id.*). Respondent argues that none of these claims were "fairly presented" to the state courts, and therefore are unexhausted and procedurally barred and should be dismissed. (Doc. No. 51 at 18-20). The Court agrees with Respondent.

As an initial matter, Petitioner failed to present his IAAC claims to every level of state court, as required. "To provide the State with the necessary 'opportunity' [to consider federal claims] the prisoner must 'fairly present' his claim in each appropriate state court . . . thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). Raising a federal claim for the first time in a habeas petition for discretionary review before the state's highest court does not serve to exhaust the claim. *See Casey v. Moore*, 386 F.3d 896, 918 (9th Cir. 2004) (Because petitioner "raised his federal constitutional claims for the first and only time to the state's highest court on discretionary review, he did not fairly present them.").

Petitioner presents no evidence, and as pointed out by Respondent, the record reflects that Petitioner did not properly raise his IAAC claims in a state habeas petition to either the state superior or appellate courts. Instead, as conceded by Petitioner, his first raised IAAC claims in his petition for writ of habeas corpus filed in the California Supreme Court on August 1, 2017. (Doc. No. 41 at 3). The California Supreme Court summarily denied the habeas petition on October 11, 2017. (*Id.*). This alone supports rejecting Petitioner's claims as unexhausted. *See Casey v. Moore*, 386 F.3d 896, 819 (9th Cir. 2004) (finding that because petitioner "raised his federal constitutional claims for the first and only time to the state's highest court on discretionary

1   review, he did not fairly present them").

2        Further, the IAAC claims advanced in his habeas petition filed in the California Supreme

3   Court do not mirror the IAAC claims raised herein.  Thus, even if Petitioner had raised his IAAC

4   either at each level of state court or to the state supreme court, his IAAC claims for federal habeas

5   purposes are unexhausted for lack of factual specificity.  As previously stated, federal habeas

6   petitioners must "fairly present" federal claims to the state courts to give the state the

7   "opportunity to pass upon and correct alleged violations of its' prisoners' federal rights."  *Picard,*

8   404 U.S. at 275.  "A thorough description of the operative facts before the highest state court is a

9   necessary prerequisite to satisfaction of the standard . . . that a federal habeas petitioner [must]

10  provide the state courts with a fair opportunity to apply controlling legal precedent to the facts

11  bearing upon his constitutional claim."  *Kelly v. Small*, 315 F.3d 1063, 1069 (9th Cir. 2007);

12  *Chacon v. Wood*, 36 F.3d 1459, 1468 (9th Cir. 1994) (A petitioner is required to present the state

13  courts "with all the operative facts giving rise to the asserted constitutional principle.").

14       In his habeas petition before the California State Supreme Court, Gonzalez claimed he

15  "received ineffective assistance of counsel for appellate process in violation of petitioner's sixth

16  and fourteenth amendment rights and Cal. Rights (Art. 1, section 16)."  (Doc. No. 28-3 at 7).  In

17  support of his claim, Petitioner stated that his appellate counsel "failed to adequately represent

18  petitioner by failing to notify or forwarding a copy of the fifth appellate order," which prevented

19  Petitioner from seeking direct review before the state supreme court.4  (*Id.*).  Additionally,

20  Petitioner stated that "[a]ppellate counsel also failed to separately raise any issues except one

21  instead relying on co-appellant's counsel to make all arguments."  (*Id.*).  Petitioner does not

22  elaborate as to what claims appellate counsel failed to raise or any other information related to the

23  ineffective assistance of appellate counsel.  Nor does he provide any facts to the state supreme

24  court relevant to the claims made in the instant federal petition.  Instead, Petitioner only argued

25  that his appellate counsel was ineffective for failing to "separately raise any issues except one

26  instead relying on co-appellant's counsel to make all arguments."  (Doc. No. 28-3 at 7).  In

27

28  _____

4 Again, Petitioner's California Supreme Court petition is difficult to read in places, but the Court is able to read all pertinent parts for its analysis.  (Doc. No. 28-3).

22

contrast, *supra*, Petitioner sets forth three specific claims related to appellate counsel's

ineffectiveness in the instant petition.  (Doc. No. 41 at 7-11).  Petitioner details for the first time

the facts and a description of these issues in this federal petition but did not provide such

specificity to the state courts below.  Respondent correctly notes that Petitioner apparently

expected the state supreme court to infer the nature of his claims from his one-word description of

"issues."  (Doc. No. 51 at 20).  This one-word description is not enough to exhaust Petitioner's

claims before the state courts.

Petitioner may be excused from this procedural default if he can establish objective cause

for failing to properly raise the claim in state court and actual prejudice from the alleged

constitutional violation.  *Coleman*, 501 U.S. at 750.  Or, in the alternative, Petitioner may be

excused if he can demonstrate there was a fundamental miscarriage of justice, which only applies

to situations where a "constitutional violation has probably resulted in the conviction of one who

is actually innocent[.]"  Murray, 477 U.S. at 479-80.  Here, Petitioner has neither made a showing

of cause and prejudice or a showing of a fundamental miscarriage of justice.  Rather, Petitioner

simply states that he has exhausted his claims.  (Doc. No. 54 at 1).

Accordingly, the undersigned finds Petitioner's IAAC claims are unexhausted.  The

undersigned further finds no reasons to excuse Petitioner from this procedural default.  The

undersigned declines to address the merits of these unexhausted claims and recommends grounds

two, three and four be dismissed.

### C.  Petitioner's Request for a Stay under *Rhines*

Petitioner requests that, in the event the Court finds any of his claims unexhausted, the

Court stay and hold in abeyance his petition so that he may exhaust his claims in state court under

the procedure set forth in *Rhines v. Weber*, 544 U.S. 269 (2005).  (Doc. No. 54 at 15).  Under

*Rhines*, a petitioner must satisfy three factors to warrant a stay: (1) the petitioner must

demonstrate there is "good cause" for the failure to exhaust; (2) the unexhausted claims are not

"plainly meritless"; and (3) the petitioner did not intentionally engage in dilatory litigation tactics.

*Id.* at 277-78.  Here, Gonzalez presents no argument in support of his request to stay the case and

accordingly, has not addressed the three *Rhines*' factors.  Therefore, the undersigned recommends

1   that Petitioner's wholly unsupported request to stay and hold his petition in abeyance be denied.

2          Further, the Court notes that even if Petitioner was given leave to exhaust his claims

3   before the state court, it is highly likely that these claims would be considered untimely by the

4   state courts and therefore would not be "properly filed" as required by federal habeas exhaustion

5   law. *See Robinson v. Lewis,* 9 Cal.5th 883, 897 (2020) ("There are no specific time limits for

6   either filing the first [habeas] petition or filing subsequent petitions in a higher court.  Instead,

7   California courts employ a *reasonablen*ess standard.  The claim must generally be presented

8   without substantial delay.")  The California Supreme Court has opined that a six-month gap delay

9   would normally be "unduly generous," but adopted "a period of 120 days as the safe harbor for

10  gap delay" for the filing of habeas petitions between state court levels.  *Id*. at 901.  Here,

11  Petitioner's last state habeas petition was denied on October 11, 2017, nearly four years ago and

12  well beyond the presumptive safe harbor period.  (Doc. No. 41 at 11).

### IV.  CERTIFICATE OF APPEALABILITY

14         State prisoners in a habeas corpus action under § 2254 do not have an automatic right to

15  appeal a final order.  *See* 28 U.S.C. § 2253(c)(1)(A); *Miller-El v. Cockrell*, 537 U.S. 322, 335-36

16  (2003).  To appeal, a prisoner must obtain a certificate of appealability.  28 U.S.C. § 2253(c)(2);

17  *see also* R. Governing Section 2254 Cases 11 (requires a district court to issue or deny a

18  certificate of appealability when entering a final order adverse to a petitioner); Ninth Circuit Rule

19  22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).

20         Here, the Court recommends denial one of Petitioner's first ground on the merits and

21  recommends dismissal of the three remaining grounds on procedural grounds.  Where a court

22  denies habeas claims on the merits, the petitioner is required to show that "jurists of reason could

23  disagree with the district court's resolution of his constitutional claims or that jurists could

24  conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-*

25  *El*, 537 U.S. at 327.  Where the court denies habeas relief on procedural grounds without reaching

26  the merits of the underlying constitutional claims, the court should issue a certificate of

27  appealability only "if jurists of reason would find it debatable whether the petition states a valid

28  claim of the denial of a constitutional right and that jurists of reason would find it debatable

whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further." *Id*. Here, reasonable jurists would not find the undersigned's conclusion debatable or conclude that petitioner should proceed further. The undersigned therefore recommends that a certificate of appealability not issue.

Accordingly, it is **RECOMMENDED**:

1. Ground one in the amended petition be DENIED.

2. Petitioner's request for a stay to exhaust grounds two, three and four be DENIED.

3. Grounds two, three and four in the amended petition be DISMISSED.

4. Petitioner be denied all relief on his amended petition (Doc. No. 41).

5. Petitioner be denied a certificate of appealability.

**NOTICE TO PARTIES**

These findings and recommendations will be submitted to the United States district judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within fourteen (14) days after being served with these findings and recommendations, a party may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).


Dated:    September 2, 2021

HELENA M. BARCH-KUCHTA
UNITED STATES MAGISTRATE JUDGE