1
2
3
4
5
6
7

8              UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  LUIS MIGUEL GONZALEZ, | Case No.  1:18-cv-00039-KES-HBK (HC) |
| 12            Petitioner, | FINDINGS AND RECOMMENDATIONS TO DENY PETITIONER RELIEF ON HIS PETITION FOR WRIT OF HABEAS CORPUS[1] |
| 13      v. | |
| 14  MICHAEL SEXTON, | FOURTEEN-DAY OBJECTION PERIOD |
| 15            Respondent. | (Doc. No. 41) |
| 16 | |

17

18    **I.      STATUS**

19          Petitioner Luis Miguel Gonzales ("Petitioner" or "Gonzalez"), a state prisoner proceeding

20    with counsel, has pending a First Amended Petition for Writ of Habeas Corpus filed under 28

21    U.S.C. § 2254 on July 16, 2020.  (Doc. No. 41, "Petition").  Petitioner challenges his convictions

22    after a jury trial for attempted murder, discharging a firearm at an occupied vehicle, and active

23    participation in a street gang.  (Case No. BF143990A).  (Doc. No. 23-2 at 12; *see* Doc. No. 28-17

24    at 174-88).[2]   The Kern County Superior Court sentenced Petitioner to nine years plus twenty-five

25    years to life in state prison.  (Doc. No. 28-1; *see* Doc. No. 28-2 at 12).

26    _____

[1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302
27    (E.D. Cal. 2022).

[2] All citations to the pleadings and record are to the page number as it appears on the Case Management
28    and Electronic Case Filing ("CM/ECF") system.

On appeal, the Fifth Appellate District ordered the trial court to amend the abstract of judgment "to reflect that [Petitioner] was sentenced to the upper term of seven years on count II" but indicated "Gonzalez's aggregate sentence w[ould] not change since the entirety of the term imposed for count II was stayed." (Case No. F068060).  (Doc. 28-2 at 53).  The appellate court otherwise affirmed the modified judgment on June 21, 2016.  (*Id.*).  Petitioner did not seek discretionary review by the California Supreme Court, instead filing a state petition for writ of habeas corpus in that court on August 1, 2017.  (Case No. S243532).  (Doc. No. 28-3).  The California Supreme Court denied the petition on October 11, 2017.  (Doc. No. 28-4).

The instant Petition advances the following four restated grounds for relief:

(1) The trial court's removal of a hold-out juror during deliberations violated Petitioner's Fourteenth Amendment right to due process and fair trial and his Sixth Amendment right to a fair and impartial jury.

(2) Petitioner received ineffective assistance of appellate counsel because appellate counsel did not raise the issue of a tainted identification procedure.

(3) Petitioner received ineffective assistance of appellate counsel because appellate counsel did not raise the trial court's use of CALCRIM 315 to instruct the jury.[3]

(4) Petitioner received ineffective assistance of appellate counsel because appellate counsel did not raise a claim of ineffective assistance of trial counsel based on trial counsel's failure to object to the identification procedures and failure to challenge jury instruction.

(Doc. No. 41 at 5-10).

Respondent filed an answer to the amended petition on December 9, 2020 (Doc. No. 51) and Petitioner filed a reply on February 22, 2021 (Doc. No. 54).  On September 3, 2021, the undersigned entered Findings and Recommendations to deny the Petition finding ground without merit, and finding the remaining grounds unexhausted.  (Doc. No. 55).  Petitioner filed objections to the Findings and Recommendations, primarily challenging the conclusion as to ground one.

---

[3] As note *infra*, Petitioner withdrew "Ground Three, and portions of Ground Four, which cited appellate counsel's failure to raise a due process challenge regarding the trial court's instruction to the jury with CALCRIM 315, allowing the jury to consider the eyewitness's certainty in its evaluation of identification testimony. The California Supreme Court rejected this argument in *People v. Lemcke*, 11 Cal.5th 644, on May 27, 2021. this ground." (Doc. No. 58 at 4, n. 2).

1    (Doc. No. 58).  In his objections, Petitioner withdrew his third ground challenging the use of

2    CALCRIM 315 as well as the portion of his fourth ground challenging appellate counsel's failure

3    to challenge the use of the same instruction.  (*Id.* at 4 n.2).  Petitioner accompanied his objections

4    with a motion to stay pursuant to *Rhines v. Weber*, 544 U.S. 269 (2005), to allow him to exhaust

5    his ineffective assistance of counsel claims in state court.  (Doc. No. 59).  On March 7, 2022, the

6    undersigned withdrew the Findings and Recommendations. and granted Petitioner's motion to

7    stay as to Petitioner's claim that appellate counsel was constitutionally ineffective for failing to

8    challenge the tainted show-up procedure (ground two) and for failing to raise an ineffective

9    assistance of counsel claim regarding the same (portion of ground four).  (Doc. No. 62).

10         On April 1, 2022, Petitioner filed a petition for writ of habeas corpus in the superior court.

11   (Case No. HC017244A).  (Doc. No. 70-1 at 1-9).  The superior court denied the petition on April

12   22, 2022.  (*Id.* at 151-62).  Petitioner then filed a similar petition in the Fifth Appellate District.

13   (Case No. F084297).  (*Id.* at 164-73).  The appellate court denied the petition as to Petitioner's

14   juror-dismissal challenge because it was denied on appeal, citing *In re Dixon*, 41 Cal. 2d 756

15   (1953), and denied without prejudice his ineffective assistance claims, citing *In re Robbins*, 18

16   Cal. 4th 770, 780 (1998) and advising that "[i]n any future petition, petitioner must explain his

17   delay in raising these claims."  (Doc. 70-1 at 389).  Following this denial, Petitioner filed a

18   petition in the California Supreme Court.  (Case No. S275813).  (*Id.* at 390-419).  The California

19   Supreme Court denied the petition on February 22, 2023, citing *In re Robbins* for the proposition

20   that "courts will not entertain habeas corpus claims that are untimely" and *In re Clark*, 5 Cal. 4th

21   750, 767-69 (1993) for the proposition that "courts will not entertain habeas corpus claims that

22   are successive."  (*Id.* at 810).

23         Subsequently, the undersigned granted Petitioner's request to lift the stay in this case.

24   (Doc. Nos. 68, 69).  Respondent filed an Amended Answer on May 9, 2023 (Doc. No. 72) and

25   Petitioner filed a Reply on June 8, 2023 (Doc. No. 74).  This matter is deemed submitted on the

26   record before the Court.  After careful review of the record and applicable law, the undersigned

27   recommends the district court deny the Petition and decline to issue a certificate of appealability.

28        ////

1    **II.    GOVERNING LEGAL PRINCIPLES**

2        **A.    Evidentiary Hearing**

3        In deciding whether to grant an evidentiary hearing, a federal court must consider whether

4    such a hearing could enable an applicant to prove the petition's factual allegations, which, if true,

5    would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474

6    (2007). "It follows that if the record refutes the applicant's factual allegations or otherwise

7    precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id*. Here,

8    this Court finds that the pertinent facts of this case are fully developed in the record before the

9    Court; thus, no evidentiary hearing is required. *Cullen v. Pinholster*, 563 U.S. 170 (2011).

10       **B.    ADEPA General Principles**

11       A federal court's statutory authority to issue habeas corpus relief for persons in state

12   custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

13   Penalty Act of 1996 (AEDPA). AEDPA requires a state prisoner seeking federal habeas relief to

14   first "exhaus[t] the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). If

15   the state courts do not adjudicate the prisoner's federal claim "on the merits," a *de novo* standard

16   of review applies in the federal habeas proceeding; if the state courts do adjudicate the claim on

17   the merits, then AEDPA mandates a deferential, rather than *de novo*, review. *Kernan v. Hinojosa*,

18   136 S. Ct. 1603, 1604 (2016). This deferential standard, set forth in § 2254(d), permits relief on a

19   claim adjudicated on the merits, but only if the adjudication:

20       (1) resulted in a decision that was contrary to, or involved an
21       unreasonable application of, clearly established Federal law, as
         determined by the Supreme Court of the United States; or

22       (2) resulted in a decision that was based on an unreasonable
         determination of the facts in light of the evidence presented in the
23       State court proceeding.

24   28 U.S.C. § 2254(d). This standard is both mandatory and intentionally difficult to satisfy.

25   *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018); *White v. Woodall*, 572 U.S. 415, 419 (2014).

26       "Clearly established federal law" consists of the governing legal principles in the

27   decisions of the United States Supreme Court when the state court issued its decision. *White*, 572

28   U.S. at 419. Habeas relief is appropriate only if the state court decision was "contrary to, or an

4

unreasonable application of," that federal law.  28 U.S.C. § 2254(d)(1).  A decision is "contrary to" clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts.  *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).

A state court decision involves an "unreasonable application" of the Supreme Court's precedents if the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."  *Williams v. Taylor*, 529 U.S. 362, 407, (2000).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011).  The petitioner must show that the state court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id*. at 103.

When reviewing a claim under § 2254(d), any "determination of a factual issue made by a State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *Burt v. Titlow*, 571 U.S. 12, 18 (2013) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.") (quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

Even if a petitioner meets AEDPA's "difficult" standard, he must still show that any constitutional error had a "substantial and injurious effect or influence" on the verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  As the Supreme Court explained, while the passage of AEDPA "announced certain new conditions to [habeas] relief," it didn't eliminate *Brecht's* actual-prejudice requirement.  *Brown v. Davenport*, 596 U.S. 118, 134 (2022).  In other words, a habeas petitioner must satisfy *Brecht*, even if AEDPA applies.  *See id.* at 138 ("[O]ur equitable

1    precedents remain applicable 'whether or not' AEDPA applies.") (*citing Fry v. Pliler*, 551 U.S.

2    112, 121 (2007)).  In short, a "federal court must *deny* relief to a state habeas petitioner who fails

3    to satisfy either [*Brecht*] or AEDPA.  But to *grant* relief, a court must find that the petition has

4    cleared both tests."  *Id.* at 134.

5        As discussed *supra*, for the deferential § 2254(d) standard to apply there must have been

6    an "adjudication on the merits" in state court.  An adjudication on the merits does not require that

7    there be an opinion from the state court explaining the state court's reasoning.  *Richter*, 562 U.S.

8    at 98.  "When a federal claim has been presented to a state court and the state court has denied

9    relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

10   of any indication or state-law procedural principles to the contrary."  *Id*. at 99.  "The presumption

11   may be overcome when there is reason to think some other explanation for the state court's

12   decision is more likely."  *Id*. at 99-100.  This presumption applies whether the state court fails to

13   discuss all the claims or discusses some claims but not others.  *Johnson v. Williams*, 568 U.S.

14   289, 293, 298-301 (2013).

15       While such a decision is an "adjudication on the merits," the federal habeas court must

16   still determine the state court's reasons for its decision in order to apply the deferential standard.

17   When the relevant state-court decision on the merits is not accompanied by its reasons,

18   > the federal court should "look through" the unexplained decision to
19   > the last related state-court decision that does provide a relevant
     > rationale. It should then presume that the unexplained decision
20   > adopted the same reasoning.  But the State may rebut the
     > presumption by showing that the unexplained affirmance relied or
21   > most likely did rely on different grounds than the lower state court's
     > decision, such as alternative grounds for affirmance that were
22   > briefed or argued to the state supreme court or obvious in the record
     > it reviewed.

23   *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).  The federal court "looks through" the silent state

24   court decision "for a specific and narrow purpose—to identify the grounds for the higher court's

25   decision, as AEDPA directs us to do."  *Id*. at 1196.

26   **III.    RELEVANT FACTUAL BACKGROUND**

27       The Court adopts the pertinent facts of the underlying offenses, as summarized by the

28   California Fifth District Court of Appeal.  A presumption of correctness applies to these facts.

1   *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

### Attempted murder of Daniel Chavez (Counts I and II)

Shortly after 1:00 a.m. on September 12, 2012, Daniel Chavez (Chavez) drove his SUV to a residence on Baker and California Streets to meet a woman. Chavez parked his vehicle on the left side of the street, in front of the residence. He called the woman and said he was there.

Chavez was waiting in his vehicle, with the engine running, when a green Chevrolet Silverado, double cab truck pulled up next to the driver's side of his vehicle. The truck's passenger door opened and a man leaned out. He asked Chavez where he was from. Chavez replied that he did not "bang" and he "wasn't from nowhere."

Chavez testified the man in the green truck's passenger seat turned toward him, pulled a handgun, and immediately fired one shot at Chavez. Chavez was wounded in his right hand. Chavez accelerated his truck and rapidly drove away. Chavez lost control because of his gunshot wound and crashed into a tree. He ran from his vehicle and tried to hide in the neighborhood. He asked a bystander to call the police. The green truck drove around the area several times. Chavez believed they were looking for him.

The police arrived at the scene and Chavez emerged from his hiding place. Chavez told the police that there were at least three people in the truck.

Chavez was taken to the hospital for treatment of a gunshot wound to his right hand. The wound left him unable to use one finger.

### Robbery of Rosa Garcia (Count III)

Also on September 12, 2012, Rosa Garcia (Garcia) was working as a taxi driver and experienced problems with the brakes on her taxi cab. Around 2:20 a.m., Garcia parked her taxi cab at the AM/PM gas station on Union Avenue and called a coworker to help her.

Garcia waited in her taxi cab and left the driver's side door open. She noticed an older model, blue/turquoise extended cab pickup truck drive by the gas pump across from her location. The truck had a loud muffler. The truck's passenger looked at Garcia. The truck went through the gas station and then drove away.

The truck returned within a few minutes. It pulled alongside Garcia's cab so that the truck's passenger door was adjacent to Garcia's driver's seat. Garcia could see both the driver and the passenger.

Garcia testified that the man sitting in the passenger seat called out to her, and asked for directions. As Garcia started to respond, the passenger got out of the truck and walked toward her. Garcia noticed the truck's driver was Hispanic. She could not see if someone was sitting in the rear extended cab section of the truck.

As the passenger approached her cab, Garcia saw a gun sticking out of his waistband. Garcia tried to close her driver's door, but the gunman stepped inside the car and told Garcia, "Give me what you got." He did not draw the gun. Garcia was afraid and told the man that she understood. Garcia turned over $142, which was her taxi fare money from that night.

The gunman got back into the passenger side of the truck, and they left the gas station. Garcia saw the truck's license plate number and entered it into her cell phone so she could tell the police.

Garcia called the police and provided a description of the truck, the passenger, and the vehicle's license plate number.

**Robbery of Francisco Gonzales (Count IV)**

Sometime around 2:30 a.m. on September 12, 2012, Francisco Gonzales (Francisco) was walking on Baker Street. A green Chevrolet truck with a loud muffler drove by him. The truck made a U-turn and drove back to Francisco's location. The truck's passenger side pulled up to Francisco's location.

Francisco testified a man got out of the passenger side of the truck and walked up to him. The man pulled a handgun, pointed it at Francisco's head, and asked where he was from. Francisco said, "I'm not from anywhere. I was just going home."

Francisco testified he begged for his life and was afraid he was going to be killed. The gunman cursed and told Francisco to give him everything he had. Francisco turned over his cell phone, knife, and cash. Francisco was terrified and said, "Please don't shoot me." The gunman took the property and then punched Francisco in the head with his fist.

The gunman returned to the passenger side of the truck, and the truck "skidded off." Francisco ran away.

Francisco called 911 at 2:31 a.m. He told the responding officer that he only saw two people in the truck.

**Arrest of Defendants**

Around 3:00 a.m. on September 12, 2012, both defendants were arrested at Israel Lopez's (Lopez) house. An older model green Chevrolet Silverado SUV was parked in front of the house, and it was registered to Lopez. The vehicle's muffler made a loud and deep noise. Defendant Gonzalez's wallet and identification were found in the driver's door compartment.

A grey Buick Regal was also parked in front of Lopez's house. Defendant Castilleja was sitting in the driver's seat. Castilleja had two black Samsung cell phones and a Metro PCS cell phone in his possession. Francisco's knife was found in the sedan.

*////*

8

1

**Identification of Defendants**

2
Shortly after defendants were arrested, the police arranged for the
victims to participate in separate infield showups just a few hours
3
after the robberies.

4
An officer drove Garcia to a location for infield showups of
Castilleja, Gonzalez, and Lopez. Garcia stayed in the police car
5
while another officer escorted each man past her location. When
the officer walked by with Castilleja, Garcia said he was too far
6
away and asked the officer to bring him closer. After she got a
closer view of his face, she identified Castilleja as the man who
7
robbed her. She also identified the green truck as the suspect's
vehicle. She separately looked at Lopez and Gonzalez, but she did
8
not identify them.

9
Around 6:00 a.m., while Chavez was being treated at the hospital's
emergency room, the police separately escorted Lopez, Gonzalez,
10
and Castilleja past his treatment room for showups. Chavez
testified that an officer told him "they caught the ones from the
11
truck, and they were going to show me them." Officer Stratton,
who conducted the showup, denied that he made that statement to
12
Chavez, and testified that he told Chavez that the people he was
going to see may or may not have been involved in the incident.
13

14
Chavez was initially asked to look at Lopez. Chavez said Lopez
"kinda" looked like the gunman, but he was not sure. Upon looking
at the other two suspects, Chavez immediately identified Castilleja
15
as the driver, and Gonzalez as the passenger and gunman.

16
A few hours after the robbery, Francisco went to the police station
and identified his cell phone. An officer asked Francisco to look at
17
some suspects in a showup. Francisco said he was too scared and
refused.
18

19
Later that morning, an officer contacted Francisco and asked him to
look at the suspects at the police station through a mirrored
window, where he would not be seen by the suspects. Francisco
20
agreed and the officer drove him to the station. The officer told
Francisco that they had some people who may or may not have
21
been involved in the crime. Francisco looked at Castilleja,
Gonzalez, and Lopez in separate showups through a mirrored
22
window.

23
Francisco said he was certain that Castilleja was the man who
robbed him. Francisco looked at Gonzalez twice and did not
24
identify him. Francisco said he was not sure if Gonzalez was
involved in the crime. Francisco did not identify Lopez, and said
25
he was certain Lopez was not involved.

26
**Defendants' Postarrest Statements**

27
After the showups, defendants Gonzalez and Castilleja were
separately interviewed at the police department.
28

9

Officer Stratton met first with Gonzalez in an interview room and advised him of the warnings pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (*Miranda*). Gonzalez agreed to answer questions.  Gonzalez acknowledged he had an "OB" tattoo that meant the Okie Bakers gang.  Gonzalez said he had been a member of the Okie Bakers since he was 13 years old, and his moniker was "Young One."  Gonzalez said Lopez was known as "Boogie," and he was also a member of the Okie Bakers.

Gonzalez said Lopez owned the green truck.  He said Lopez picked him up in the truck on September 11, 2012, and he stayed with Lopez until the police arrested him later on September 12, 2012.

Stratton then met with Castilleja in an interview room and advised him of the *Miranda* warnings.  Castilleja agreed to answer questions, and said that Lopez was known as "Boogie."

Officer Stratton testified that after the interviews, Castilleja and Gonzalez were held in adjacent holding cells that were separated by a wall.  Officer Stratton heard defendants talk about whether they were going to jail and who they would see there.  Castilleja asked Gonzalez, "Who was that fool that we had to stand in front of at the hospital."  Gonzalez replied, "That was the fool from the truck. Remember."  Castilleja replied, "Serio?"  Officer Stratton believed that meant, "Seriously."  Gonzalez said, "Yep."

**Interview With Lopez**

Officer Stratton later spoke with Lopez, who acknowledged his nickname was "Boogie."  There was a photograph of Lopez with both defendants on Lopez's cell phone.  Lopez said Gonzalez was known as "Young One" and Castilleja was known as "Grinch." Lopez had tattoos that said "KC" and the "O" symbol from the Baltimore Orioles.  Stratton suspected the tattoos were gang related, and referred to Kern County and the Okie Bakers.  He asked Lopez about these tattoos.  Lopez said he was a fan of the Kansas City and Baltimore baseball teams, but he did not know anything about the teams or the names of the players.

Lopez said he loaned his truck to defendants that night; he did not go with them; they did not return to his house; and he went to bed.

Yesenia Lara, Lopez's cousin, told the police that Lopez was with her all night and never left the house.

Lopez was released from custody and not charged in this case.

**Trial Identifications**

At trial, Chavez testified he only saw the driver and passenger in the truck that pulled up next to his vehicle.  He identified Gonzalez as the passenger and the gunman who shot him.  Chavez initially testified that he could not recall if there was a third person sitting in the rear cab section.  On further questioning, Chavez testified he

1    might have seen a third person in the truck's rear cab.

2    It was stipulated that as Chavez entered the courtroom to testify, he
     saw Lopez in the hallway and identified him as the third person
3    who was in the truck that pulled up next to his vehicle.

4    Garcia testified that Castilleja was the gunman who robbed her in
     her cab.  Garcia testified she did not identify anyone as the driver
5    because he was too far away to see his face.

6    Francisco testified he only saw a driver and a passenger in the truck
     that stopped next to him as he was walking home.  He identified
7    Castilleja as the passenger and gunman who robbed him on the
     street.  He did not really see the driver.  He did not notice anyone
8    else in the vehicle.

9    **Lopez's Trial Testimony**

10   Lopez testified he owned the green Chevrolet truck.  He testified
     both defendants were hanging out at his house on the afternoon and
11   evening of September 11, 2012.  Around 10:00 p.m., Lopez loaned
     his truck and cell phone to defendants.  Defendants left in the truck
12   and said they were going to the store.  Lopez did not go with them.

13   Defendants did not return and he went to sleep.  The police arrived
     around 3:00 a.m. on the morning of September 12, 2012.  Lopez
14   denied being involved in any gang activity.

15   **Gang Evidence**

16   Officer Ryan Vaughn testified as the prosecution's gang expert and
     explained the Okie Bakers was a criminal street gang that operated
17   in Bakersfield.  The Okie Bakers associated with the color blue.  It
     had feuds with the East Side Bakers, Colonia Bakers, and the
18   Norteños.  The gang's primary activities were weapons violations,
     murder, assaults with deadly weapons, shootings, robberies,
19   narcotics sales, and burglaries.

20   Officer Vaughn testified about several predicate offenses
     committed by members of the Okie Bakers (other than defendants)
21   in 2009 and 2011, which involved drug sales, firearms, and
     shootings.  Vaughn believed the gang was involved in an ongoing
22   pattern of criminal activity.

23   Several officers testified about numerous personal contacts with
     both defendants in 2009, 2011, and 2012, which did not involve
24   arrests.  The officers testified they saw defendants' tattoos
     signifying the Okie Bakers, and defendants admitted they were
25   members of the Okie Bakers.  Castilleja said his moniker was
     "Grinch," and Gonzalez said his moniker "Young One."
26
     Officer Vaughn testified that based on his personal contacts with
27   both defendants, their tattoos, and their prior statements, he
     believed defendants were active members of the Okie Bakers gang
28   in September 2012.  He considered Lopez to be an associate of the

1    gang.

2    In response to a series of hypothetical questions, Officer Vaughn
3    believed that if two members of the Okie Bakers borrowed a car
     from an associate of the gang, and they committed armed robberies
     and fired shots at the victims, the offenses were gang related
4    because robberies and assaults with deadly weapons were among
     the primary activities of that gang.  Vaughn testified that when a
5    gang member asks, "where are you from," that was a gang-
     motivated challenge about the other person's presence in a
6    particular area of turf.

7    (Doc. No. 28-2 at 3-11).

8    ## IV.    ANALYSIS

9    As noted, following the undersigned's previous recommendation, Petitioner withdrew

10   ground three and a portion of ground four.  Those claims need not be addressed further, and the

11   remaining claims are addressed below.

12   ### A.    Ground One-Excused Juror

13   In his first ground, Petitioner claims the trial court's removal of a holdout juror during

14   deliberations violated his right to due process and a fair trial under the Fourteenth Amendment

15   and to a fair and impartial jury under the Sixth Amendment.  (Doc. No. 41 at 5).  Respondent

16   frames ground one as a jury unanimity claim and argues such was not raised in the state courts.

17   (Doc. No. 51 at 15).  In the now withdrawn Findings and Recommendations, the undersigned

18   rejected Respondent's exhaustion challenge because Petitioner did not frame his challenge as a

19   jury unanimity claim but rather asserted that the removal of the juror itself violated his

20   constitutional rights.  (*See* Doc. No. 55 at 12-13).  The undersigned adopts the same reasoning

21   and addresses ground one on the merits.[4]  In doing so, the Court looks through to the Fifth

22   Appellate District's reasoned decision in evaluating the claims under the deferential standard of

23   review.  *Wilson*, 138 S. Ct. at 1192.

24   ////

25   _____

[4] Further, even if Petitioner's claim is unexhausted, "[a]n application for a writ of habeas corpus may be denied on
26   the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."
     28 U.S.C. § 2254(b)(2).  To the extent Respondent continues to dispute the undersigned's characterization of
27   Petitioner's claim, (Doc. No. 72 at 7-8), a jury unanimity claim still fails on the merits because, as Respondent
     argues, the Supreme Court did not hold that a state jury must be unanimous to convict a criminal defendant of a
28   serious offense until 2020 and this "new rule of criminal procedure" does not apply retroactively.  *Edwards v.
     Vannoy*, 593 U.S. 255, 258 (2021).

### 1. Background

The trial court dismissed juror number 7 on the third day of deliberations after concluding she was biased against law enforcement and was using her own personal beliefs and experiences to inform her decision making, rather than following the law and jury instructions. (Doc. No. 28-2 at 27-29). Preceding the dismissal, the jurors wrote three notes to the judge. The first note stated: "In the case where a juror is using 'life experience,' and claims to have been treated wrongly by police in the past and refuses to believe police officers' testimony, what is the rest of the jury to do?" (Doc. No. 28-13 at 9). At that point, the judge read some of the jury instructions to the jury regarding deliberations. (*Id*. at 16-23).

Juror number 7 then sent a note stating: "Honor, I feel the other juries are trying to gang up on me to change my mind. I feel this is unfair and I'm not letting them bully me into change my verdict." (*Id.* at 25). The judge then questioned juror number 7 individually. (*Id*. at 27-32). Juror number 7 said she was considering her life experiences in making decisions, but that she did not discount any witness' testimony based on her life experiences. (*Id*.). The judge next interviewed the foreperson, who stated that all the jurors were able to express themselves fully. (*Id*. at 37-38). The judge reread a portion of the jury instructions concerning keeping an open mind and openly exchanging thoughts and ideas to the jury. (*Id.* at 39).

Juror number 7 sent another note, stating: "The foreman has told me that she differently [sic] this I am bias. I voted to get a new foreman. I don't feel I am being bias, and I don't think the foreman has the right to determine I am bias or not for using my personal knowledge. One should not be considered bias because I explained my personal experience. I'm not joining with major [sic]." (Doc. 28-14 at 6). The judge again questioned juror number 7, and she stated that she was using her life experience in her decision making, the foreperson had called her biased, she was not biased against law enforcement, and she was willing to continue deliberating. (*Id.* at 20-37).

The judge interviewed the foreperson again, asking her whether she had told juror number 7 that she was biased. (Doc. No. 28-15 at 11). The foreperson told the judge that juror number 7 had said that some police officers are dishonest and that she had been profiled by police officers.

13

(*Id*. at 11-12).  The foreperson said juror number 7 refused to follow the jury instructions and instead relied on her personal experience to make decisions about the case.  (*Id*. at 13).  The judge next interviewed each of the jurors separately.  (*Id*. at 16-47).  All the jurors said that juror number 7 was using her own experience of being profiled by the police rather than the law provided by the court to make her decisions and that she was basing her decisions on her outside knowledge of the law.  (*Id*.).  Some of the jurors opined that juror number 7 was biased against law enforcement.  (*Id*.).

At the close of the judge's questioning of the jurors, the defense moved for a mistrial and the state moved to dismiss juror number 7.  (*Id*. at 47-49).  The judge denied the defense's motion for mistrial and granted the state's motion to dismiss juror number 7.  (*Id*. at 58).  The judge found that juror number 7 had a "blanket mistrust of law enforcement and of all witnesses called by the prosecution."  (*Id*.).  Moreover, the judge found that juror number 7's statement that she knows the law and is applying that law rather than the law as explained in the jury instructions was improper.  (*Id*. at 59).  The judge said that juror number 7 "exhibited bias against law enforcement" and "refused to follow the law in that she's injected her own understanding of the law and her own beliefs as to what the law says particularly, but not limited to, her discussion of when six-packs and in-field show ups should be done."  (*Id*. at 60).  The judge then dismissed juror number 7.  (*Id*. at 62).

Soon after the court dismissed the juror, she submitted a letter to counsel and the court.  (Doc. No. 41-6).  In summary, juror number 7's letter stated she was not convinced by the evidence presented by the prosecution, some of the jurors berated her when she shared her opinions, some jurors called her biased, and the trial judge stated she could use her life experiences when deliberating.  (*See generally id*.).  The defense then moved for a new trial due to juror number 7's letter, which the judge denied.  (Doc. No. 28-2 at 33-34).

## 2.  State Court Decision

The state appellate court considered and ultimately rejected Petitioner's juror removal claim as follows:

*////*

14

## A. <u>Discharge of a Juror During Deliberations</u>

"As soon as a jury is selected, each juror must agree to render a true verdict ' "according only to the evidence presented … and *to the instructions of the court*." ' [Citation.]" (*People v. Williams* (2001) 25 Cal.4th 441, 448, italics added in original.) "A juror's duty is to weigh the evidence and credibility of witnesses with impartiality and to reach a fair and unbiased verdict. [Citations.]" (*People v. Thomas* (1990) 218 Cal.App.3d 1477, 1484.)

"[T]he jury must follow the court's instructions, 'receiv[ing] as law what is laid down as such by the court.' [Citation.]" (*People v. Engelman* (2002) 28 Cal.4th 436, 442 (*Engelman*).) A juror who is "actually biased," who refuses to follow the court's instructions, or who refuses to deliberate "is unable to perform the duty to fairly deliberate and thus subject to discharge. [Citations.]" (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1051; *People v. Williams*, *supra*, 25 Cal.4th at p. 448; *Engelman*, *supra*, 28 Cal.4th at p. 442.)

"The trial court may discharge a juror for good cause at any time, including during deliberations, if the court finds that the juror is unable to perform his or her duty. [Citation.] 'When a court is informed of allegations which, if proven true, would constitute good cause for a juror's removal, a hearing is *required*. [Citations.]' [Citation.] If the trial court has good cause to doubt a juror's ability to perform his duties, the court's failure to conduct a hearing may constitute an abuse of discretion on review. [Citations.] 'Grounds for investigation or discharge of a juror may be established by his statements or conduct, including events which occur during jury deliberations and are reported by fellow panelists. [Citations.]' [Citation.] (*People v. Lomax* (2010) 49 Cal.4th 530, 588 (*Lomax*), italics in original.)

"Great caution is required in deciding to excuse a sitting juror." (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 71.) "[T]he court may not discharge a juror for failing to agree with the majority of other jurors or for persisting in expressing doubts about the sufficiency of the evidence in support of the majority view [citation] …." (*Engelman*, *supra*, 28 Cal.4th at p. 446.) "The circumstance that a juror does not deliberate well or relies upon faulty logic or analysis does not constitute a refusal to deliberate and is not a ground for discharge. Similarly, the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts ... does not constitute a refusal to deliberate and is not a ground for discharge." (*People v. Cleveland* (2001) 25 Cal.4th 466, 485; *People v. Wilson* (2008) 44 Cal.4th 758, 824 (*Wilson*).)

However, a juror who refuses to follow the court's instructions because of a personal bias or any other reason, or who proposes to reach a verdict without respect to the law or evidence, commits misconduct and should be discharged under section 1089. (*Engelman*, *supra*, 25 Cal.4th at pp. 442, 448; *People v. Fuiava* (2012) 53 Cal.4th 622, 713.) "[A] juror is required to apply the law as instructed by the court, and refusal to do so *during deliberations*

may constitute a ground for discharge of the juror. [Citation.]" (*Engelman*, *supra*, 28 Cal.4th at p. 443, italics in original.)

"A sitting juror's actual bias, which would have supported a challenge for cause, renders [her] 'unable to perform [her] duty' and thus subject to discharge and substitution....." (*People v. Keenan* (1988) 46 Cal.3d 478, 532.) It has been recognized that "no amount of questioning" of a juror may "lead to an outright admission of bias," and the trial court may properly rely "upon the testimony of other jurors in determining the issue." (*People v. Thomas*, *supra*, 218 Cal.App.3d at p. 1485.) "[T]rial courts are frequently confronted with conflicting evidence on the question whether a deliberating juror has exhibited a disqualifying bias. [Citation.] 'Often, the identified juror will deny it and other jurors will testify to examples of how he or she has revealed it.' [Citation.] In such circumstances, the trial court must weigh the credibility of those testifying and draw upon its own observations of the jurors throughout the proceedings. We defer to factual determinations based on these assessments. [Citation.]" (*Lomax*, *supra*, 49 Cal.4th at p. 590.)

"Although decisions to investigate juror misconduct and to discharge a juror are matters within the trial court's discretion [citation], we have concluded 'a somewhat stronger showing' than is typical for abuse of discretion review must be made to support such decisions on appeal. [Citation.]" (*Lomax*, *supra*, 49 Cal.4th at p. 589.) "[T]he basis for a juror's disqualification must appear on the record as a '*demonstrable reality*.' This standard involves 'a more comprehensive and less deferential review' than simply determining whether any substantial evidence in the record supports the trial court's decision. [Citation.] It must appear 'that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that bias was established.' [Citation.] However, in applying the demonstrable reality test, we do not reweigh the evidence. [Citation.] The inquiry is whether 'the trial court's conclusion is manifestly supported by evidence on which the court actually relied.' [Citation.]" (*Id.* at pp. 589-590, first italics added, second italics in original, fn. omitted; *People v. Homick* (2012) 55 Cal.4th 816, 899.)

"In reaching that conclusion, the reviewing panel will consider not just the evidence itself, but also the record of reasons the court provides. A trial court facilitates review when it expressly sets out its analysis of the evidence, why it reposed greater weight on some part of it and less on another, and the basis of its ultimate conclusion that a juror was failing to follow the oath. In taking the serious step of removing a deliberating juror the court must be mindful of its duty to provide a record that supports its decision by a demonstrable reality." (*People v. Barnwell*, *supra*, 41 Cal.4th at p. 1053.) "That heightened standard more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury." (*Id.* at p. 1052.)

////
////

16

1

**B.  <u>Analysis</u>**

2   We begin with the process used by the court in this case. When the
trial court is notified that a juror has a disqualifying bias, it has a
3   duty to investigate the allegation. (*Lomax*, *supra*, 49 Cal.4th at p.
592.) "Out of concern to protect the sanctity of jury deliberations,
4   we have cautioned that this inquiry 'should be as limited in scope as
possible' and 'should focus upon the conduct of the jurors, rather
5   than upon the content of the deliberations.' [Citation.]
'Additionally, the inquiry should cease once the court is satisfied
6   that the juror at issue is participating in deliberations and has not
expressed an intention to disregard the court's instructions or
7   otherwise committed misconduct, and that no other proper ground
for discharge exists.' [Citation.]" (*Ibid.*)

8

9   The court's inquiry in this case was sufficiently restrained. In
response to the foreperson's first note, it initially questioned the
10  foreperson and reinstructed the jury. It then questioned Juror No. 7,
and asked what it could do to assist the deliberative process. Juror
No. 7 asked the court to speak to the foreperson on her behalf. The
11  court did so, again re-instructed the jury, and advised the prosecutor
there was no basis to remove Juror No. 7.

12

13  It was only after Juror No. 7's second note, and her responses to the
court's questions, that the court decided to question the rest of the
jurors. In doing so, the court did not affirmatively ask the other
14  jurors about Juror No. 7, and did not permit the attorneys to
question the jurors. Instead, the court generally asked the jurors
15  whether everyone had the chance for free and open discussion.
Nearly every juror responded by bringing up Juror No. 7 on his or
16  her own accord, and offered similar descriptions of Juror No. 7's
repeated refusals to follow the instructions, intent to rely on her
17  alleged personal knowledge of the law, and her avowed personal
bias against all law enforcement officers because of an unrelated
18  incident.

19  The court's careful examination of each juror, and its lengthy
findings, created a record which showed a demonstrable reality that
20  Juror No. 7 committed misconduct during deliberations by deciding
the case based on her own personal bias. "[A] bias against law
21  enforcement officers that renders a juror unable to fairly weigh
police testimony is grounds for the juror's replacement.
22  [Citations.]" (*People v. Barnwell*, *supra*, 41 Cal.4th 1038, 1051.)
Juror No. 7's categorical position that all law enforcement
23  witnesses were not credible, regardless of the evidence, "reflected
an undisclosed bias that rendered [her] unable to perform [her] duty
24  as a juror and properly subject to discharge under section 1089.
[Citation.]" (*Lomax*, *supra*, 49 Cal.4th at p. 591.)

25

26  Nearly every juror independently attributed these type of comments
to Juror No. 7. Juror No. 2 (the foreperson) said Juror No. 7 did not
believe the witnesses based on her "personal experience" of being
27  profiled, but Juror No. 7 never explained how she used her personal
experience to decide the credibility of witnesses. Juror No. 1 said
28  that Juror No. 7 did not believe the police based on her life

experience. Juror No. 5 quoted Juror No. 7 as saying that she judged the credibility of witnesses based on her prior experience of being stereotyped by the police. According to Juror No. 8, Juror No. 7 said she did not "believe a word" the testifying officers said because of her prior experiences. Juror No. 10 did not identify Juror No. 7 as the source, but similarly said a juror kept talking about her prior bad experiences with the police, and "she wants to dismiss all the officers' testimonies" because of her bad experiences. Juror No. 10 also said this particular juror said she was not going to believe the facts or the law of the case "because of what she's seen in her history." Juror No. 11 quoted Juror No. 7 as saying "she didn't believe any of the officers" because of her " 'life experience.' "

Juror No. 7 also committed misconduct by insisting that she personally knew the law based on her employment experience, and her stated refusal to follow the court's instructions on the law. As explained by Juror No. 3, Juror No. 7 said she "knew how the law worked specifically." Juror No. 4 said Juror No. 7 claimed to have "a knowledge of the law outside of the law that we were to put into this case," and Juror No. 7 said her knowledge of the law "superseded the jury instructions that we had." Juror No. 2 (the foreperson) said Juror No. 7 did not want to follow the instructions. Juror No. 5 stated that Juror No. 7 said she knew the law because she worked with correctional officers, and she was relying on her alleged knowledge of the law instead of the law and evidence as presented at trial. Juror No. 8 similarly quoted Juror No. 7 as saying she "knows the law." Juror No. 9 quoted Juror No. 7 as saying that she knew the law, and the police "botched" the case because it was the "law" to test for gunshot residue. According to Juror No. 11, Juror No. 7 said she knew the law, she worked around officers, she knew some of them were bad, and "that's why she's not believing any of the officers, their testimony."

Defendants assert that a juror does not commit misconduct by relying on his or her personal experiences. Defendants are correct that courts "expect jurors to use their own life experiences when evaluating the evidence. [Citation.]" (*Wilson*, *supra*, 44 Cal.4th at p. 823.) "[D]uring the give and take of deliberations, it is virtually impossible to divorce completely one's background from one's analysis of the evidence. We cannot demand that jurors, especially lay jurors not versed in the subtle distinctions that attorneys draw, never refer to their background during deliberations." (*People v. Steele* (2002) 27 Cal.4th 1230, 1266.)

"It is not improper for a juror, regardless of his or her educational or employment background, to express an opinion on a technical subject, so long as the opinion is based on the evidence at trial. Jurors' views of the evidence, moreover, are necessarily informed by their life experiences, including their education and professional work." (*In re Malone* (1996) 12 Cal.4th 935, 963.)

"A juror may not express opinions based on asserted personal expertise that is different from or contrary to the law as the trial court stated it or to the evidence, but if we allow jurors with specialized knowledge to sit on a jury, and we do, we must allow

those jurors to use their experience in evaluating and interpreting that evidence." (*People v. Steele*, *supra*, 27 Cal.4th at p. 1266.) However, "[a] fine line exists between using one's background in analyzing the evidence, which is appropriate, even inevitable, *and injecting 'an opinion explicitly based on specialized information obtained from outside sources,' which we have described as misconduct.* [Citation.]" (*Ibid.*, italics added) "A juror … should not discuss an opinion explicitly based on specialized information obtained from outside sources. Such injection of external information in the form of a juror's own claim to expertise or specialized knowledge of a matter at issue is misconduct. [Citations.]" (*In re Malone*, *supra*, 12 Cal.4th at p. 963.)

For example, *Wilson* held that the trial court erred in removing a juror at the penalty phase because the record did not show to a "demonstrable reality" that he was unable to perform his duty. (*Wilson*, *supra*, 44 Cal.4th at p. 814.) The challenged juror explained that his decision was based on mitigating evidence about the defendant's abusive and dysfunctional family. (*Id.* at pp. 814, 824.) Although the juror appeared to have weighed the mitigating evidence more heavily than did the other jurors because of his experience as an African–American father, *Wilson* concluded his reliance on life experience was appropriate at the penalty phase and did not render him unable to serve. (*Id.* at p. 831.) In contrast to *Wilson*, there was no indication in this case that Juror No. 7 relied on any admissible evidence, aside from her own personal experience, to conclusively determine that all law enforcement witnesses in this case were not credible. Instead, she repeatedly stated that she did not believe the prosecution witnesses because of her prior experience being "racially profiled" in Rosedale.

Juror No. 7's conduct was similar to the situation addressed in *In re Stankewitz* (1985) 40 Cal.3d 391, where a juror " 'consulted' his own outside experience as a police officer on a question of law," and reached a legal conclusion that was "totally wrong." (*Id.* at p. 399.) *Stankewitz* held that had the juror merely kept his opinion to himself, "his conduct might be the type of subjective reasoning that is immaterial for purposes of impeaching a verdict." (*Id.* at p. 400.) But his actions rose to the level of reversible misconduct when he shared the erroneous opinion with other jurors, and vouched for its correctness on the strength of his long service as a police officer. (*Ibid.*)

When the trial court addressed this situation, defendants complained that the court should have brought Juror No. 7 back for further questions after it had talked to the other eleven jurors, in order for Juror No. 7 to refute the allegations they made against her. A trial court, having heard evidence of a juror's "disabling bias," is permitted but not required to attempt "to rehabilitate that juror by further exploring what the juror really meant," and the court does not abuse its discretion "concluding there was no need to question [the juror] further because [her] disqualification was clear …." (*People v. Fuiava*, *supra*, 53 Cal.4th at p. 715.)

The trial court did not abuse its discretion when it declined to

question Juror No. 7 for a third time. It had talked to Juror No. 7 twice, and Juror No. 7 had already made inconsistent statements about her conduct. During the second round of questions, the court asked Juror No. 7 what type of personal experience she was relying on. Juror No. 7 said she had worked for the military and the government since she was 18 years old, she had worked for the Department of Corrections for 13 years, and added, "[s]o why [*sic*] I … be bias against police officers or law enforcement?" The court asked Juror No. 7 whether she had used her "special knowledge or experience" to judge the witnesses instead of considering the evidence. Juror No. 7 said no, and complained the other jurors were bullying her. Upon further questioning, however, Juror No. 7 contradicted herself when the court asked if she had negative personal experiences with law enforcement. Juror No. 7 said she told the jurors that she had been racially profiled by the police in Rosedale, she told the jurors what happened to her, and that factored into her determination that a law enforcement witness was not credible.

The other 11 jurors, when generally asked about whether each juror had been able to freely discuss his or her opinions, separately attributed identical statements to Juror No. 7 - that she did not believe any of the prosecution witnesses because of her personal experience, and she was going to rely on her own knowledge of the law and not on the court's instructions.

Defendants also complained that the other 11 jurors committed misconduct toward Juror No. 7 because Juror No. 7 reached a different verdict, and disagreed with their opinions and conclusions. "[R]emoval of a holdout juror is proper where the facts demonstrate the juror is unable to follow the law. [Citation.]" (*People v. Harrison* (2013) 213 Cal.App.4th 1373, 1382.) The "trial court's attempt to ensure the jurors understood the law," and removal of a holdout juror who would not or could not follow the law, "cannot be viewed as an improper attempt to overcome a deadlock in the jury's deliberations." (*People v. Alexander* (2010) 49 Cal.4th 846, 928.) "The substitution of a juror for good cause pursuant to section 1089, even after deliberations have commenced, ' "does not offend constitutional proscriptions." ' [Citation.]" (*Wilson, supra,* 44 Cal.4th at pp. 820-821.)

### New trial motion following juror removal

Finally, while defendants have not addressed Castilleja's new trial motion, we find the court did not abuse its discretion when it denied the motion. The new trial motion was solely based on Juror No. 7's notarized statement, obviously prepared after she had been excused from the jury. Juror No. 7 restated the allegations she made to the court, that the other jurors were acting improperly toward her because they disagreed with her, and made new allegations of misconduct against the other jurors.

"When a party seeks a new trial based upon jury misconduct, a court must undertake a three-step inquiry. The court must first determine whether the affidavits supporting the motion are

20

admissible. [Citation.] If the evidence is admissible, the court must then consider whether the facts establish misconduct. [Citation.] Finally, assuming misconduct, the court must determine whether the misconduct was prejudicial. [Citations.] A trial court has broad discretion in ruling on each of these questions and its rulings will not be disturbed absent a clear abuse of discretion. [Citation.]" (*People v. Perez* (1992) 4 Cal.App.4th 893, 906.)

"Juror declarations are admissible to the extent that they describe overt acts constituting jury misconduct, but they are inadmissible to the extent that they describe the effect of any event on a juror's subjective reasoning process. [Citation.] Accordingly, juror declarations are *inadmissible* to the extent that they purport to describe the jurors' understanding of the instructions or how they arrived at their verdict. [Citations.]" (*Bell v. Bayerische Motoren Werke Aktiengesellschaft* (2010) 181 Cal.App.4th 1108, 1124-1125, italics added; Evid. Code, § 1150; *People v. Steele, supra,* 27 Cal.4th at p. 1261.)

As the trial court noted, the majority of Juror No. 7's declaration was inadmissible because it reflected the deliberative process. The trial court found Juror No. 7's allegations that other jurors committed misconduct by consulting outside resources were not credible. The court's finding is supported by the record. Juror No. 7 had two opportunities to speak to the court about deliberations. Each time, Juror No. 7 freely complained that she was being bullied by the other jurors. When asked if she had anything more to add, Juror No. 7 never claimed the other jurors were consulting outside sources or otherwise violating the instructions. The court was also concerned by Juror No. 7's conduct immediately after she was excused from the jury, when she refused to leave the courthouse, tried to contact the remaining jurors, and appeared the following day to deliver sealed letters to the court and the attorneys and announced they had been "served."

In any event, we note that Juror No. 7 declared in her notarized statement that on the day she was dismissed, a juror said "the process needed to be concluded on that day because he did not want to return for another day of deliberations." Even if we were consider Juror No. 7's notarized statement, we find no evidence that her removal coerced the verdict. Juror No. 7 was removed on August 8, 2013. The alternate juror was seated on the morning of August 9, 2013, and the court instructed the reconstituted jury to begin deliberations anew. There is no evidence the jury failed to follow the court's instructions, particularly since the jury did not return the verdicts until August 12, 2013, and the verdicts were not blanket findings of guilt. (See, e.g., *People v. Fuiava*, *supra*, 53 Cal.4th at p. 716.)

We conclude that defendant's statutory and constitutional rights to due process and a fair trial were not violated because the trial court's finding of good cause to dismiss Juror No. 7 is supported to a demonstrable reality, and the court did not abuse its discretion when it denied Castilleja's motion for new trial.

1    (Doc. No. 28-2 at 35-45).

2    ### 3.  Federal Habeas Analysis

3    Petitioner argues the trial court's removal of juror no. 7 during deliberations violated both

4    his right to due process and a fair trial, as well as his right to an impartial jury.  (Doc. No. 41 at

5    5).  However, Petitioner wholly fails to engage with the state court's analysis or explain why such

6    is contrary to, or an unreasonable application of, Supreme Court precedent or based on an

7    unreasonable determination of the facts.  (*See id.*).  Respondent asserts the state court's rejection

8    of this claim was reasonable and Petitioner is not entitled to habeas relief.  (Doc. No. 72 at 7-8).

9    The Sixth Amendment guarantees a criminal defendant the right to a "fair trial by a panel

10    of impartial, indifferent jurors."  *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (citation modified).  A

11    defendant is entitled to a jury composed of "jurors who will conscientiously apply the law and

12    find the facts," *Lockhart v. McCree*, 476 U.S. 162, 178 (1986), and that is "capable and willing to

13    decide the case solely on the evidence before it," *McDonough Power Equip., Inc. v. Greenwood*,

14    464 U.S. 548, 554 (1984).  While the Constitution "lays down no particular tests" to determine

15    whether a juror is biased, *United States v. Wood*, 299 U.S. 123, 146 (1936), the Supreme Court

16    has held an impartial jury consists of "jurors who will conscientiously apply the law and find the

17    facts."  *Wainwright v. Witt*, 469 U.S. 412, 423 (1985); *see also Lockett v. Ohio*, 438 U.S. 586,

18    596-97 (1978) ("[T]he right to a representative jury [does not include] the right to be tried by

19    jurors who have explicitly indicated an inability to follow the law and instructions of the trial

20    judge."); *Irvin*, 366 U.S. at 723 (defining an "impartial juror" as one who "can lay aside his

21    impression or opinion and render a verdict based on the evidence presented in court"); *see also*

22    *Williams v. Johnson*, 840 F.3d 1006, 1010 (9th Cir. 2016) ("Although we know that biased jurors

23    may be dismissed from deliberations without offending the Constitution, we don't know precisely

24    what it means for a juror to be biased.").

25    Here, the state court of appeal found that "[t]he [trial] court's careful examination of each

26    juror, and its lengthy findings, created a record which showed a demonstrable reality that Juror

27    No. 7 committed misconduct during deliberations by deciding the case based on her own personal

28    bias."  (Doc. No. 28-2 at 39).  The record reflects the trial court interviewed all 11 jurors at least

1  once and interviewed juror no. 7 and the foreperson multiple times.  Moreover, Petitioner's

2  counsel participated fully in the juror misconduct hearings.  The court of appeal recounted the

3  jurors' testimony regarding juror number 7, finding that the jurors' statements sufficiently

4  demonstrated that juror number 7 was biased.  (Doc. No. 28-2 at 39).  The appellate court found

5  that juror number. 7's "categorical position that all law enforcement witnesses were not credible,

6  regardless of the evidence" demonstrated an undisclosed bias that made it impossible to perform

7  her duty as a juror.  (*Id.*).  The court of appeal also found that juror number 7 "committed

8  misconduct by insisting that she personally knew the law based on her employment experience,

9  and her stated refusal to follow the court's instructions on the law."  (*Id.*).  The appellate court

10 found that "[t]he other 11 jurors, when generally asked about whether each juror had been able to

11 freely discuss his or her opinions, separately attributed identical statements to [j]uror [number] 7

12 that she did not believe any of the prosecution witnesses because of her personal experience, and

13 she was going to rely on her own knowledge of the law and not on the court's instructions."  (*Id.*

14 at 43).  Essentially, the state court found that juror 7 "indicated an inability to follow the law and

15 instructions of the trial judge."  *Lockett*, 438 U.S. at 596-97 (finding no error in excusal of jurors

16 verniremen who "could not be trusted to abide by existing law and to follow conscientiously the

17 instructions of the trial judge").

18      Based on a review of the record, Gonzalez fails to show that the appellate court's denial of

19 his juror dismissal claim was contrary to, or an unreasonable application of, clearly established

20 federal law, or that the appellate court's decision was based on an unreasonable determination of

21 fact.  Accordingly, the undersigned recommends that ground one be denied.

## B.      Grounds Two and Four-Ineffective Assistance of Counsel

23      In grounds two and four, Petitioner alleges he received ineffective assistance of appellate

24 counsel in violation of his Sixth Amendment rights.  (Doc. No. 41 at 7-10).  Ground two raises a

25 claim based on appellate counsel's failure to raise the issue of a tainted identification procedure

26 involving Chavez.  (*Id.* at 7).  Ground four raises a claim based on appellate counsel's failure to

27 raise an ineffective assistance of trial counsel claim based on trial counsel's failure to challenge

28 the same identification procedure.  (*Id.* at 10).

23

1    Respondent argues Petitioner's claims are untimely, not properly exhausted and therefore

2    barred, and meritless.  (Doc. No. 72 at 10-12).

3          **1.  Timeliness**

4        The Court has previously addressed the timeliness of the initial petition in addressing

5    Respondent's motion to dismiss.  (*See* Doc. No. 19).  Of relevance, the previously assigned

6    magistrate judge determined that pursuant to 28 U.S.C. § 2244(d)(1)(D), AEDPA's one-year

7    statute of limitations began to run on April 7, 2017, the date Petitioner learned his appeal had

8    already been briefed and decided, and expired on April 7, 2018.  (*Id.* at 2-4).  Thus, because the

9    initial petition was filed on January 8, 2018, the petition was timely and the magistrate judge

10   recommended denying Respondent's motion to dismiss.  (*Id.* at 3).  The district court adopted the

11   recommendation in full.  (Doc. No. 23).

12       The question now presented is whether the *amended* petition, filed on July 16, 2020, was

13   timely.  Respondent argues that even using the April 7, 2017 start date, Petitioner's AEDPA

14   deadline expired on June 26, 2018, based on a period of tolling while a state habeas petition was

15   pending.  (Doc. No. 72 at 10).  Petitioner does not challenge this calculation, and the

16   undersigned's independent review of the record does not reveal any additional state court

17   proceedings that would toll the statute of limitations under 28 U.S.C. § 2244(d)(2).  Thus, the

18   AEDPA statute of limitations expired on June 26, 2018, before the amended petition was filed,

19   such that the amended petition was untimely.  While Petitioner argues the grant of a *Rhines* stay

20   tolled the statute of limitations (*see* Doc. No. 74 at 3-4), Petitioner did not file his motion for a

21   *Rhines* stay until October 11, 2021.  (Doc. No. 59).  Because the AEDPA statute of limitations

22   expired before the stay was granted, the stay cannot operate to toll the deadline.[5]

23       However, the claims in the "amended petition may be considered if they 'relate back' to

24   claims asserted in the original petition" pursuant to Federal Rule of Civil Procedure 15(c), which

25   applies in federal habeas proceedings.  *Williams v. Filson*, 908 F.3d 546, 557 (9th Cir. 2018).  In

26

---

27   [5] To the extent Petitioner's argument can be construed as asserting that the Court's finding that a *Rhines* stay was
warranted also entitles him to equitable tolling of the statute of limitations, he fails to cite any case law in support of

28   such a conclusion.  In the absence of clear argument, the undersigned declines to address equitable tolling, especially
given that Petitioner's claims are subject to dismissal on alternative grounds.

1    determining whether an amended petition relates back to an original petition, courts must first

2    "determine which claims are alleged in the amended petition and what core facts underlie those

3    claims" and then "look at the body of the original petition and exhibits to see whether they

4    attempted to or did set forth a corresponding factual basis." *Bejarano v. Reubart*, 136 F.4th 873,

5    901 (9th Cir. 2025). "The claims in the amended petition relate back if they expand on, correct,

6    or modify the facts set forth in the original petition." *Id.*

7          Here, the initial petition raised two claims: (1) a challenge to the removal of juror number

8    7 and (2) ineffective assistance of appellate counsel based on counsel's failure to notify Petitioner

9    of the appellate decision and failure to "adequately raise all viable issues." (Doc. No. 1 at 4).

10    The amended Petition seems to expand on the second claim by challenging appellate counsel's

11    failure to raise specific issues. (Doc. No. 41 at 7, 10). However, because the initial petition "did

12    not identify either of the sub-claims [Petitioner] now raises," the amended petition does not relate

13    back to the initial petition. *Bejarano*, 136 F. 4th at 903 (claims in amended petition that appellate

14    counsel was ineffective for failing to challenge admission of certain testimony did not relate back

15    to initial petition which asserted that appellate counsel "provided ineffective assistance of counsel

16    for not raising the many other remaining issues"). Because the amended petition does not relate

17    back, it is untimely.

18                  **2.   Procedural Default**

19          Alternatively, Respondent argues Petitioner's ineffective assistance of appellate counsel

20    claims are procedurally defaulted because the California Supreme Court denied his claims on

21    state habeas review "for not complying with state procedures that are adequate and not dependent

22    on the merits of the barred claim." (Doc. No. 72 at 10-11). Petitioner does not substantively

23    respond to this argument, instead once again pointing the *Rhines* stay and asserting that "[t]he

24    claims now exhausted are before this Court for a determination on the merits." (Doc. No. 74 at

25    4).

26          "A federal habeas claim is technically exhausted but procedurally defaulted if the state

27    court declined to address the claim based on independent and adequate state procedural grounds."

28    *Rodney v. Garrett*, 116 F.4th 947, 954 (9th Cir. 2024) (citing *Coleman v. Thompson*, 501 U.S.

1    722, 729-32 (1991)).  For a claim to be procedurally defaulted, the state procedural rule relied on

2    must be "a nonfederal ground adequate to support the judgment" and be "firmly established and

3    consistently followed." *Martinez v. Ryan*, 566 U.S. 1, 9 (2012).  Federal courts are generally

4    prohibited from reviewing procedurally defaulted claims. *Coleman*, 501 U.S. at 729-30.  "A state

5    prisoner may overcome the prohibition on reviewing procedurally defaulted claims if he can show

6    'cause' to excuse his failure to comply with the state procedural rule and 'actual prejudice

7    resulting from the alleged constitutional violation.'" *Davila v. Davis*, 582 U.S. 521, 528 (2017).

8         Here, the California Supreme Court denied review of Petitioner's ineffective assistance of

9    appellate counsel claims, citing *In re Robbins*, 18 Cal. 4th 770, 780 (1998) and *In re Clark*, 5 Cal.

10   4th 750, 767-69 (1993).  (Doc. No. 70-1 at 810).  These cases provide that "[a] prisoner must seek

11   habeas relief without 'substantial delay,' as 'measured from the time the petitioner or counsel

12   knew, or reasonably should have known, of the information offered in support of the claim and

13   the legal basis for the claims.'" *Walker v. Martin*, 562 U.S. 307, 312 (2011) (internal citations

14   omitted).  Thus, "[a] summary denial citing *Clark* and *Robbins* means that the petition is rejected

15   as untimely." *Id.* at 313.  The timeliness rule established by *Robbins* and *Clark* is firmly

16   established and regularly followed such that it is an adequate procedural ground to bar habeas

17   relief. *Id.* at 311.

18        Because the California Supreme Court rejected Petitioner's claims on independent and

19   adequate state procedural grounds, the undersigned agrees with Respondent that Petitioner's

20   claims are procedurally defaulted and, by failing to respond to this argument, Petitioner has failed

21   to establish a reason to excuse the default.

22                          **3.  Merits**

23        Even if Petitioner's claims are not untimely and/or procedurally defaulted, Respondent

24   argues they fail on the merits.  (Doc. 72 at 11-12).  Respondent argues appellate counsel was not

25   obligated to raise every nonfrivolous or potentially meritorious claim and it would have been

26   highly unlikely that appellate counsel could show that trial counsel acted unreasonably in failing

27   to challenge the identification procedures.  (*Id.*).  Additionally, Respondent asserts the "counseled

28   Petition merely had conclusory assertions that the in-court identification was tainted" without

1   argument in support.  (*Id.* at 12).  Finally, Respondent argues Petitioner ignores other identity

2   evidence beyond the tainted identification.  (*Id.* at 12).

3       In his traverse, Petitioner argues the identification procedures the victim testified to—

4   specifically, that "a police officer told him the police had 'caught the ones from the truck, and

5   they were going to show me them;' and 'they (the police) had the persons who did it'"—were

6   impermissibly suggestive under *Neil v. Biggers*, 409 U.S. 188, 198 (1972).  (Doc. No. 74 at 4-5).

7   Because "Chavez's testimony reveals an in-field identification procedure which was unfair,"

8   Petitioner asserts trial counsel's failure to raise an objection and appellate counsel's failure to

9   challenge the tainted procedure "was prejudicially ineffective."  (*Id.* at 6).

10      Criminal defendants have a right to counsel at trial and on direct appeal.  U.S. Const.

11  Amend VI.  Claims alleging that trial or appellate counsel were constitutionally ineffective

12  require the Court to engage in the two-step analysis set forth in *Strickland v. Washington*,

13  466 U.S. 668 (1984).  Under the first prong of that test, the petitioner must prove that his

14  attorney's representation fell below an objective standard of reasonableness.  *Id*. at 687-88.

15  To demonstrate deficient performance, the petitioner must show his counsel "made errors so

16  serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the

17  Sixth Amendment."  *Id*. at 687; *Williams v. Taylor*, 529 U.S. 362, 391 (2000).  In reviewing

18  trial counsel's performance, however, "counsel is strongly presumed to have rendered

19  adequate assistance and made all significant decisions in the exercise of reasonable

20  professional judgment."  *Strickland*, 466 U.S. at 690; *Yarborough v. Gentry*, 540 U.S. 1, 8

21  (2003).  Only if counsel's acts and omissions, examined within the context of all the

22  circumstances, were outside the "wide range" of professionally competent assistance, will

23  petitioner meet this initial burden.  *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986);

24  *Strickland*, 466 U.S. at 689-90.

25      Under the second part of *Strickland's* two-prong test, the petitioner must show that he

26  was prejudiced by counsel's conduct.  466 U.S. at 694.  Prejudice is found where there is a

27  reasonable probability that, but for his counsel's errors, the result would have been different.

28  *Id*.  The errors must not merely undermine confidence in the outcome of the trial but must

27

1  result in a proceeding that was fundamentally unfair.  *Williams*, 529 U.S. at 393 n.17;

2  *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).  The petitioner must prove both prongs:

3  deficient performance and prejudice.  A court need not, however, determine whether

4  counsel's performance was deficient before determining whether the petitioner suffered

5  prejudice as the result of the alleged deficiencies.  *Strickland*, 466 U.S. at 697 ("If it is easier

6  to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we

7  expect will often be so, that course should be followed.").

8       Here, Petitioner raised his ineffective assistance of appellate counsel claims in his state

9  habeas petitions after he was granted a *Rhines* stay in this action.  (*See generally* Doc. 70-1).

10  Both the Fifth Appellate District and the California Supreme Court denied the claims as untimely

11  under *Robbins*.  (*Id.* at 389, 810).  However, the superior court addressed the claims on the merits.

12  (*See id.* at 152-62).  In doing so, the superior court cited and applied the relevant standard under

13  *Strickland*.  (Doc. No. 70-1 at 156-158).  Based on the incomplete trial transcripts provided by

14  Petitioner, the superior court concluded the "one-at-a time identification procedure was not

15  unduly suggestive," citing *Stovall v. Denno*, 388 U.S. 293 (1967).  (*Id.* at 159).  The court

16  concluded there was a "strong possibility that a motion to exclude the initial identifications made

17  by the Victim would have been denied" such that trial counsel's failure to bring such a motion did

18  not amount to defective performance under *Strickland*.  (*Id.* at 159-60).  Since the superior court

19  found that "Petitioner does not have a viable IAC claim against his trial counsel," it also

20  concluded "Petitioner ha[d] not demonstrated that his appellate counsel's performance fell below

21  an objective standard of reasonableness by failing to raise an IAC claim in the appeal."  (*Id.* at

22  161).  Additionally, the superior court concluded Petitioner had "not demonstrated that there is a

23  reasonable probability that, bur for any possible errors on the part of his appellate counsel, the

24  result of the proceeding would have been different."  (*Id.*).

25       As the superior court concluded, Petitioner cannot satisfy either prong of the *Strickland*

26  standard with respect to his trial counsel's performance.  First, he cannot show that his counsel's

27  failure to object to the identification procedures fell below an objective standard of

28  reasonableness because the facts surrounding the identification where sufficiently analogous to

1  those in *Stovall*[6] that any motion to suppress the identification would likely have been denied.

2  Further, counsel seemed to make a strategic decision not to challenge the identification

3  procedures and to instead focus on Chavez's comment that first individual he was shown, Israel

4  Lopez, looked similar to the shooter except the shooter had a hat on, and Chavez's subsequent

5  identification of Petitioner based in part on the hat he was wearing.  (Doc. 28-9 at 19-20; *see also*

6  Doc. 28-12 at 49-50 (counsel's closing argument asking whether it was the hat or Petitioner

7  himself that got identified)).  This strategic decision does not equate to deficient performance.

8  *See   Pirtle v. Scribner*, 311 F. App'x 76, 79 (9th Cir. 2009) (rejecting ineffective assistance

9  habeas claim based on counsel's failure to move to suppress suggestive identification because

10  "counsel reasonably relied on a mistaken identity theory, attacking the identification evidence

11  throughout the trial").

12      Even if counsel's failure to object to the identification procedures was not reasonable,

13  Petitioner cannot show prejudice from this failure because there was additional evidence linking

14  him to Chavez's shooting.  Chavez identified photos of the truck the shooter was in, and Lopez

15  identified the same photos as the truck he loaned to Petitioner and his codefendant.  (Doc. No. 28-

16  7 at 123; Doc. No. 28-8 at 16-18).  A wallet containing Petitioner's identification and credit cards

17  in Petitioner's name was found in the driver's side door pocket of the truck.  (Doc. 28-8 at 84-86,

18  88-91).  Chavez also identified Petitioner in court as the individual who shot him.  (Doc. No. 28-7

19  at 136-37).

20      Because Petitioner cannot establish either prong of the *Strickland* test with respect to his

21  trial counsel's performance, Petitioner cannot establish that his appellate counsel was ineffective

22  for failing to challenge trial counsel's performance on appeal.  *See Smith v. Robbins*, 528 U.S.

23  259, 285 (2000) (to succeed on a claim of ineffective assistance of appellate counsel, a petitioner

24  must "demonstrate that counsel acted unreasonably in failing to discover and brief a merit-worthy

25  issue").  Further, given the finding of a lack of prejudice based on the additional evidence linking

26

27

28

---

[6] In *Stovall*, officers showed the suspect to the victim in her hospital room while she was receiving treatment for injuries she sustained.  388 U.S. at 295.  The Court concluded that given the totality of the circumstances—including that the officers were "[f]aced with the responsibility of identifying the attacker, with the need for immediate action and with the knowledge that [the victim] could not visit the jail" such that the showup was "the only feasible procedure"—the identification procedures were not unduly suggestive.  *Id.* at 302.

Petitioner to the shooting, Petitioner cannot show that he was prejudiced by appellate counsel's failure to raise the identification issue on appeal. *Moormann v. Ryan*, 628 F.3d 1102, 1106 (9th Cir. 2010) (to show prejudice under *Strickland* in the appellate context, "the petitioner must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal").

Based on the foregoing, the undersigned recommends that Petitioner be denied relief on grounds two and four because his claims are untimely, procedurally defaulted, and meritless.

## V.    CERTIFICATE OF APPEALABILITY

A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district court's denial of a petition; he may appeal only in limited circumstances. *See* 28 U.S.C. § 2253; *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). Rule 11 Governing § 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order adverse to a petitioner. *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997). A certificate of appealability will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires the petitioner to show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *accord Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because Petitioner has not made a substantial showing of the denial of a constitutional right, the undersigned recommends that the court decline to issue a certificate of appealability.

Accordingly, it is **RECOMMENDED**:

1.  Petitioner be DENIED all relief on his First Amended Petition for Writ of Habeas Corpus (Doc. No. 41); and

2.  Petitioner be denied a certificate of appealability.

### NOTICE TO PARTIES

These Findings and Recommendations will be submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 14 days after

being served with a copy of these Findings and Recommendations, a party may file written objections with the Court. *Id.*; Local Rule 304(b). The document should be captioned, "Objections to Magistrate Judge's Findings and Recommendations" and shall not exceed **fifteen (15) pages**. The Court will not consider exhibits attached to the Objections. To the extent a party wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its CM/ECF document and page number, when possible, or otherwise reference the exhibit with specificity. Any pages filed in excess of the fifteen (15) page limitation may be disregarded by the District Judge when reviewing these Findings and Recommendations under 28 U.S.C. § 636(b)(l)(C). A party's failure to file any objections within the specified time may result in the waiver of certain rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).


Dated:    August 18, 2025

HELENA M. BARCH-KUCHTA
UNITED STATES MAGISTRATE JUDGE